**John M. Wolf, Appellee, v. Peoples Bank, Executor of Estate of Fred Wolkau, Deceased, Appellant.**

**Gen. No. 8,332.**

128

Opinion filed October 23, 1929.

LEDERER, LIVINGSTON, KAHN & ADLER and BRACKEN, LIVINGSTON & MURPHY, for appellant; W. K. BRACKEN and SIGMUND LIVINGSTON, of counsel.

R. B. FOSTER, for appellee.

Mr. Justice Shurtleff delivered the opinion of the court.

Appellee filed a claim in the probate court of McLean county against the estate of Fred Wolkau, Jr., deceased, based upon two promissory notes, one dated April 12, 1926, for $1,750, due on or before two years after date, with interest at 7 per cent per annum; and one note dated June 7, 1926, for $7,500, due ten years after date, with interest at 6 per cent per annum.

The Peoples Bank of Bloomington, executor of the last will of Fred Wolkau, Jr., appellant, through its vice president and trust officer, George F. Dick, filed in said cause, in the probate court, an affidavit denying that the purported signature to said two promissory notes was signed or executed by said Fred Wolkau, Jr.; also that there was no consideration for said promissory notes, and that said supposed promissory notes are not a just claim against the estate of said deceased, and that there is no amount due on said claim.

In the probate court, appellee produced one witness, a lay expert, who testified that in his opinion the signatures were the genuine signatures of the deceased. The executor offered no evidence. The probate judge then called the appellee to the witness stand and inquired concerning the basis of the notes, under the provisions of the statute, section 65, Cahill's St. ch. 3, ¶ 66.

At this time appellee produced two slips of paper upon which were written the name Fred Wolkau, Jr., and also produced two other notes which had been torn to pieces and pasted together upon a transparent piece of paper. Appellee stated to the court that he was producing these papers to show that he had made previous loans to the deceased, and he claimed it was the habit of the deceased, whenever a note was paid, either to tear off the signature and hand the signature to

appellee, or else tear up the note and hand the pieces of the torn note to appellee, so that appellee would have something to show that he had held the notes of the deceased. He stated that he had many other signatures of the deceased.

The appellant did not offer any evidence and the claim was allowed; also, at the same time, an appeal was allowed to the circuit court where the claim was tried *de novo*.

The two notes voluntarily produced by appellee, which were torn apart and pasted together by him, and the two slips of paper, containing the signatures of deceased, produced by appellee to the probate judge, together with the two notes sued upon, are exactly reproduced by photographs in this cause, some of them much enlarged. The photographs and original instruments introduced in evidence are before this court.

Appellant, the executor, upon the trial in the circuit court, offered the evidence of John Tyrrell and Jay Fordyce Wood, handwriting experts, and seven active bankers of Bloomington, all of whom testified that the signature to the two notes upon which this claim is based in their opinion was not the genuine signature of Fred Wolkau, Jr. Appellee produced one handwriting expert, James Ennis, one banker and three other laymen, who had received checks or receipts from deceased, and who testified that in their opinion the signatures to the two exhibits were or appeared to be the signatures of the deceased.

Appellee in the circuit court was not sworn and did not offer his own testimony on any matter. His testimony given in the probate court was read to the jury by appellant.

J. Fordyce Wood testified that the signatures upon the two slips of paper were not the genuine signatures of the deceased, and that each signature was a forgery. This testimony was not contradicted. Appellee produced on the trial in the circuit court an exhibit, an

exact photographic copy of which appears in the record, as well as one much enlarged. This exhibit is dated April 17, 1926, and Fred Wolkau's signature appears upon the same. It recites the receipt of $1,750 from John M. Wolf, in cash as a loan "for which I gave him my promissory note dated April 12, 1926." The claim of appellee and his witnesses is that this note, dated April 12, 1926, was in fact executed the 7th or 8th day of June, 1926, and dated back. This written admission, however, is dated April 17, 1926, on which date said note dated April 12, 1926, was not in existence.

This paper clearly shows that all of the area above the signature had contained previous writings which had been erased. This is apparent to the naked eye, and through a magnifying glass is clearly established. The enlarged photographs were for the purpose of showing the character and texture of the paper and clearly show that the entire surface above the signature was erased and a new writing placed thereon.

Appellee also produced on the trial an exhibit, a photographic copy of which appears in the record, which is dated October 4, 1926, signed by Fred Wolkau, Jr., and which is a recital of the supposed consideration of the $7,500 note. This exhibit was enlarged by photograph, and likewise shows that the surface of the paper above the signature had had previous writings thereon which were entirely erased and then the present writing placed thereon. This is also noticeable with the naked eye when the paper is held in the proper light; under a magnifying glass it clearly shows, and the enlarged photograph clearly shows it to be a fact. The exhibit last mentioned was in the following form:

"Bloomington, Illinois, Oct. 4, 1926.

"On February 2nd, 1926, I gave to John M. Wolf, a contract or option for Five Hundred Dollars for one year to purchase my lot at the corner of Washington

and East St. in Bloomington, Ill., for $50,000.00. In June, 1926, I closed a sale for the lot for Sixty thousand dollars for a Ninety-nine year lease.

"For the surrender of that contract or option I gave to John M. Wolf my promissory note, dated June 7, 1926, payable on or before ten years from date, with interest at six per cent per annum from date until paid with a consideration in the note of Seventy-five Hundred Dollars. The consideration of Seventy-five hundred dollars in the note was for the surrender of the contract given by me to Wolf.

"Fred Wolkau, Jr."

Appellee also produced a writing, a photographic copy of which appears in the record. It is dated October 4, 1926, and is signed "Fred Wolkau, Jr." This instrument is as follows:

"Order to my administrator, trustee and attorney, in case of my death, or John M. Wolf's, I hereby authorize each and all of them to pay two notes I signed, payable to John M. Wolf, one for $7500.00 dated June 7, 1926, one for $1750.00 dated April 12, 1926."

This paper likewise shows that the entire area above the signature had contained other writing which was erased and then the present writing placed thereon. It is not contended but that the signatures to the last three instruments are the genuine signatures of the deceased, but it is claimed that each of the instruments is spurious. All of these instruments were written and signed with an indelible pencil and marks and indications are pointed out tending to show that on the last three instruments the signatures were there prior to the writings being placed above the signatures, respectively.

The witnesses J. Fordyce Wood and John Tyrrell both testified that they had carefully examined the entire surface of the last three instruments under a magnifying glass and under microscopes, and testified that all three of these exhibits show a previous writing had

been erased and rewriting placed thereon after the erasure of the previous writing. There was no evidence offered to contradict the evidence of these two expert witnesses. The expert witness, Mr. James Ennis, called by appellee, was not questioned concerning this matter. Therefore, the evidence concerning this point is uncontradicted.

It was claimed by appellee that the note for $7,500 was given to him in consideration of the surrender of an option to purchase a vacant lot on East Washington Street in Bloomington theretofore given to him by deceased. The option was not produced, neither was any witness produced who had ever read the option or knew its contents. Appellee produced two witnesses who claimed they were present at the time of the signing of the two notes. One, by the name of Charles Lucas, a resident of Décatur, who claimed that he casually happened to be in the office at the time, and the other, Andrew Phillips, who had never known appellee and had not known the deceased, and who also happened to be there. Neither one of these men was related to appellee. In the probate court appellee stated to the probate judge that when the deceased did this business and signed these notes he ran everybody out of the room except his (appellee's) relatives. He mentioned at that time as being present at the time of the execution, his niece, Blanche Phillips, his nephew, Orland Golden, another nephew, Orville George, and the husband of Blanche Phillips, Henry Phillips, and Mary Britten. None of these relatives was called as a witness except Orville George, and he failed to remember and the court struck out his evidence. Charles Lucas was a witness for this same appellee in a case like the one at bar heretofore pending in this court, namely *Wolf v. Mattox*, 193 Ill. App. 482.

It was claimed that the $1,750 note was for money loaned. Appellee testified in the probate court that part of this loan was procured from a certificate of

deposit in his name, cashed by him in the First National Bank of Bloomington, for $1,100. Appellant offered to prove by the assistant cashier of the First National Bank that no $1,100 certificate of deposit had been issued to or cashed by appellee. This evidence was excluded by the court. The transaction in question is supposed to have occurred in the building on Main and Grove streets in Bloomington owned by deceased, the second floor of which was rented by appellee, and on this second floor appellee operated a hotel. To this second floor there is a tall stairway without landings. Appellee's two witnesses testified that the deceased climbed this stairway alone, was about the hotel, went to the telephone and apparently possessed all of his physical vigor. The notes are supposed to have been signed at this hotel on the evening of either the 7th or 8th of June, 1926. The $7,500 note is dated June 7, 1926. Appellee in his testimony in the probate court stated that the $1,750 note was executed at the same time but predated to April 12, 1926. However, appellant offered the testimony of several witnesses tending to show that the deceased, Wolkau, had been a very sick man, and was sick during all this time; that he was brought to the Peoples Bank by two attendants on June 6, 1926, for the purpose of arranging for a lease on the East Washington Street vacant lot; that he was taken from his bed, dressed by one of the attendants, put into an automobile and the two attendants brought him to the bank; that by supporting him under his arms, one on each side, he was brought into the bank and taken into the directors' room and placed in a seat; that when he left he was likewise assisted and put into the automobile; that he was again brought to the bank in the same manner the next day, June 7, 1926, and again taken to the directors' room assisted. Attorneys John J. Morrissey, John O. Morrissey, Fred Dick, vice president of the bank, and others testified that he was unable to walk; that when

assisted he would shuffle his feet, and the two attendants, William Feltz and Gus Scholtz, testified as to how he was brought to the bank on both occasions; that when he was returned home on June 7, he was put into his bed, where he remained several days and then went to West Baden.

The witness Lucas was impeached by numerous witnesses from Decatur, who testified that his reputation for truth and veracity was bad. Attention is called to the two notes torn up and repasted together, which appellee in the probate court testified were handed back to him by the deceased when the notes in question were given. The $500 note shows an indorsement of $500, paid June 7, 1926, and a further undated indorsement of $47.06. The other $200 note, after being pasted together, shows the following indorsements: June 7, 1926, paid $75 on note; July 12, 1926, paid $75 on note; Oct. $75 on note. Appellee apparently derived satisfaction from thinking he was receiving payments whether the money was actually paid or not.

There was a verdict and judgment in behalf of appellee for the full amount of the notes, and appellant has brought the record by appeal to this court for review.

For the consideration of certain assignments of error it may be sufficient to say that on the trial appellant introduced testimony tending to show that the signatures of the deceased upon the two notes in question were not the genuine signatures of the deceased, and that there was no consideration for either of said notes; nevertheless, the court instructed the jury in behalf of appellee that appellee was required to prove, to entitle him to recover, as to each note respectively, that said note was signed by Fred Wolkau, Jr., and delivered by him to the claimant; but as to the defenses of fraud and want of consideration, the claimant is not required to prove the consideration for said note by

a preponderance of the evidence, nor is the claimant required to prove that there was no fraud in the transaction, but you are instructed that the burden is upon the defendant bank to prove, by the preponderance of the evidence, one of the defenses of fraud or want of consideration; and if you find from a preponderance of the evidence that said note was signed by Fred Wolkau, Jr., and deliverd by him to the claimant, and if you further find that the Peoples Bank has failed to prove, by a preponderance of the evidence one of the defenses of fraud or want of consideration for the said note in question, then you should find the issues for the claimant and assess his damages on said note at the principal sum of said note and the interest due thereon.

A similar instruction was given as to each of the two notes. Section 24 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 44, provides, that every negotiable instrument is deemed prima facie to have been issued for a valuable consideration. This statutory provision does not change the rule as to the burden of proof. Burden of proof and the burden to go forward with the evidence are entirely different propositions. The burden of proof never shifts. The fact that the statute makes the production of the instrument prima facie evidence that it is based on a valid consideration merely creates a presumption. Whenever such presumption is met by any evidence, the burden of proof is the same as at common law, and is on the plaintiff. This question concerning statutory provisions by virtue of which prima facie matters are established without proof, is fully explained by Justice Cartwright in the opinion of *Johnson v. Pendergast,* 308 Ill. 255, 262. The court said:

"The existence of the prima facie case is provisional, and does not change the burden of proof but only the burden of introducing further evidence. It means only that a determination of a fact shall be sufficient to

justify a finding of a related fact in the absence of any evidence to the contrary. The only effect is to create the necessity of evidence to meet the prima facie case created, and which, if no proof to the contrary is offered, will prevail. . . . As soon as opposing evidence is received, the case is to be determined upon all the evidence, the prima facie evidence and all other evidence, and the question is whether the weight preponderates in favor of the party having the burden of proof.''

In *Owens v. Nagel,* 334 Ill. 96, 101, the court held:

''Under section 59 of the statute, in the first instance, defendant in error was deemed prima facie to be a holder in due course. This presumption continued until evidence was produced by plaintiff in error to show the contrary. If no such evidence was produced the presumption continued that defendant in error was a holder in due course. If evidence was introduced tending to show that the title of Erisman was defective, then the burden was on defendant in error to prove that he, or some person under whom he claimed, acquired title in due course.''

The subject has been fully discussed in *Stewart v. Illinois Cent. R. Co.,* 184 Ill. App. 412, 418; *Holley v. Smalley,* 269 Fed. 694; *Best v. Rocky Mountain Nat. Bank of Central City,* 37 Colo. 149, 7 L. R. A. (N. S.) 1035, and it is said in Daniels on Negotiable Instruments (5th), vol. 1, sec. 164:

''While a bill or negotiable note imports itself a consideration, yet when evidence has been introduced to rebut the presumption which it raises, the burden is upon the plaintiff to satisfy the jury on all the evidence, and by the preponderance of evidence, that there was a consideration. The mere production of the instrument does not shift upon the defendant the burden of proving that there was no consideration. The production of the note has been said to be prima facie evidence

of a consideration, sufficient, if not rebutted, to maintain plaintiff's case. But to hold that such an admission in the note of the consideration thereof changes the burden of proof and compels the defendant to assume it, it would be to hold that such an admission, when made orally, would have the same effect.''

In this cause proofs were presented by appellant under proper pleadings, tending to show that appellee was not a holder in due course, and that the notes were each forgeries. This brought the case squarely within section 58 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 78, which provides: ''In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable.'' The balance of the section has no bearing upon this cause. In addition, if the notes are forgeries, there can be no presumption as to delivery, consideration or any other material incident connected with either of them. *Hunter v. Harris,* 131 Ill. 482, 488. Whatever rule was followed in the older cases under section 9 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 29, before the adoption of the Uniform Act in 1907, it has given way to the specific provisions of the later act, and this is emphasized by the ruling of the court in *Owens v. Nagel, supra,* and *Justice v. Stonecipher,* 267 Ill. 448. It was error to instruct the jury as to the burden of proof on the issue of want of consideration as set out, and the court erred in not giving appellant's instructions upon that subject.

The court instructed the jury for appellee as follows:

''The court instructs the jury that if you find from a preponderance of the evidence that any instrument offered in evidence has the appearance of having been altered, the law raises no presumption as to when the change was made or by whom. These are questions of fact to be found by the jury; and in determining these questions the jury should look at the instrument itself,

as well as to all the circumstances in evidence, for an explanation, and thus determine whether the alteration, if any, was made before or after the execution of the instrument, and whether such alteration was made with or without the consent of the deceased, Fred Wolkau, Jr.''

Appellee produced in evidence three separate instruments bearing dates of April 17, 1926, October 4, 1926, and a third of October 4, 1926, respectively, which have been set out and over the objection of appellant these instruments were admitted in evidence. These instruments, purporting to be admissions or statements of the deceased, are the only substantial evidence in the record of any consideration, for the notes in question. The instrument of April 17, 1926, is apparently written with a lead pencil upon note paper, with lines ruled in blue ink. The other two instruments are written with an indelible pencil on similar ruled paper. The signature on each of the instruments is doubtless the signature of the deceased. There is some testimony tending to show that the writing in the body of each instrument is the handwriting of appellee. The uncontradicted testimony shows—and this is confirmed by ocular demonstration—that there has been a writing on each of these three instruments throughout its entire body above the signature, which has been erased, removed and the surface of the paper broken; and the present writing on each instrument appears over the erased writing and abrazures and mutilated lines. Strange to say, the signature appears on each instrument at the end of the line, upon which line, respectively, the abrazures appear, and the present writing is added close up to the signature on each instrument. This is peculiar, suspicious and highly presumptuous of a spurious instrument. In the record there is no explanation of these abrazures and mutilation, and no offer to explain. Appellee did not

offer himself as a witness for any purpose. The notes in question are written with an indelible pencil upon paper quite similar, but the lines are more faded, somewhat wider and there are erasures in the body of the notes. As to alteration and mutilation of instruments, the true rule seems to be laid down in *Anderson v. Augustana College,* 300 Ill. 72, 85, in which the court said:

"When an alteration is suspicious in appearance and not satisfactorily explained, the conclusion of fact follows against the instrument, but the appearance of the instrument may furnish a satisfactory explanation without extrinsic evidence."

In *Merritt v. Boyden & Son,* 191 Ill. 136, 154, the court held:

"It is true that, where an alteration appears on the face of the note, the holder must explain it, and show that it was made under such circumstances as not to vitiate the instrument. (3 Randolph on Commercial Paper—2d ed.—sec. 1785; *Walters v. Short,* 5 Gilm. 252; *Hodge v. Gilman,* 20 Ill. 437.) In the case at bar, the note was admitted in evidence by the court upon an inspection thereof. The presumption is, that there were no alterations apparent upon the face of the note, which required explanation, or the court would not have admitted it in evidence without first calling for proof explaining the alteration. Whether or not the court erred in so admitting the note without requiring such explanatory proof, is a matter, which cannot be determined by us, because the original note has not been produced for our inspection. Such a course should have been pursued. (*Riley v. Dickens, supra; Yocum v. Smith, supra; Prins v. South Branch Lumber Co., supra.*)"

In *Gage v. City of Chicago,* 225 Ill. 218, 220, the court held:

"The first reason urged by the appellant as a ground for a reversal in this court is, that the trial court erred

in admitting in evidence, over his objection, a certified copy of the improvement ordinance, upon the face of which, it is said, there appeared certain material erasures and interlineations, without requiring the appellee to explain said apparent alterations. The law indulges no presumption as to when a change in a written instrument was made, but requires the party offering an altered instrument in evidence, if the alteration is material, to explain such alteration satisfactorily to the court before the instrument will be admitted in evidence. Such explanation may satisfactorily appear from the instrument itself or it may be made by extrinsic evidence. (*Reed v. Kemp,* 16 Ill. 445; *Catlin Coal Co. v. Lloyd,* 180 id. 398; *Webster v. Yorty,* 194 id. 408; *Landt v. McCullough,* 206 id. 214.)'' The same rule was followed in *Catlin Coal Co. v. Lloyd,* 180 Ill. 398, and in *Hutchison v. Kelly,* 276 Ill. 438, 444.

The original instruments are certified to this court and are before us. They are instruments extremely unnatural in the nature of the writings in the purpose for which they purport to have been given and in the mutilations upon the respective pages, and it expresses it lightly to say that they are grossly suspicious. If it were a man's custom to give or require a separate assurance as to the integrity of his negotiable instrument, and he should once make such assurance upon a mutilated and abrazed page, it might be accounted an accident; but to make three separate assurances about the substantially same business transaction, all within six months upon three separate independent sheets of paper, each sheet mutilated and abrazed in the same manner, could not be accomplished honestly once in a million times. The instruments are not only suspicious, they look spurious. Take the instrument of April 17, 1926. Deceased either said or is made to say: ''Received Seventeen hundred fifty dollars of John M. Wolf, in cash as a loan, in money, for which I gave him my promissory note dated April 12th, 1926,

payable on or before two years after date,'' etc. Why was this instrument given? For what purpose was it given? Did Fred Wolkau, Jr., the deceased, fear that some one would dispute his note in appellee's hands? If Wolkau had honestly given appellee a note, common experience teaches us that he would not have felt the necessity of further assurances. If he had felt such necessity, Wolkau would certainly have mentioned the matter in his will made a few months later, October 29, 1926. This will was made with great care and specific attention as to the administering the details of his estate. Wolkau never felt the necessity of any such assurances. He had and left a considerable estate and appellant offered to prove that at all times he had ample credit at the banks, which evidence should have been admitted. The only other person interested in any such assurances was appellee. Why should appellee have been suspicious of this paper? If the instrument of April 17, 1926, is a genuine assurance of a bona fide contract entered into on April 12, 1926, why were appellee's suspicions aroused five days after the note was given, April 12, 1926? Appellee stated he had done much business with Wolkau and knew all about him; he had taken many of his notes; but the instrument of April 17, 1926, does not state the truth, according to appellee's testimony in the probate court. The note mentioned in the statement dated April 12, 1926, had not been executed. Appellee testified in the probate court that this note was not executed until June 7, 1926, and was dated back to April 12, 1926. Either this testimony was untrue or it renders the instrument of April 17, 1926, spurious. Appellee testified in the probate court that the loan of $1,750 was made first in April, 1925, and that to make the loan appellee cashed a certificate of deposit he held upon the First National Bank of Bloomington. Appellant offered to prove that appellee never had or cashed a certificate of deposit

on said bank, which the court refused to admit. This was error. Appellee produced the pieces of two notes which had been torn up—and which he claimed he held —signed by the deceased and of which appellee claimed the $1,750 was a renewal. One note was for $500 and one was for $200. These notes are before us and when pasted together show payments made upon the notes in substantial amounts on June 7, 1926, July 12, 1926, and in October of the same year. These indorsements impeach the integrity of the $1,750 note and furnish the motive for appellee to desire further assurances on paper which he now claims to have held, but of which he was fearful at that time and desired further assurances. The proof is that appellee felt so insecure with these notes and the further written statements reciting the consideration by the maker, and doubting the effective force of the law to protect his claims in the orderly course of administration, that he either actually or magically forced his debtor to give a personal order upon his administrator or trustee and attorney to pay these claims in case of his death or the death of appellee. Apparently the notes looked suspicious to appellee. Appellee testified in the probate court that the notes were executed in the Main Street hotel at Bloomington on the evening of June 7, 1926; there were present appellee and the deceased, Andrew Phillips, Henry Phillips and his wife, Charles Lucas, Orville George, Orland Golden and another woman. Appellee testified that Wolkau ran everyone out of that room except "they were relatives of mine (appellee's)." There were two witnesses who testified as to the making of the notes. Andrew Phillips testified as follows:

"I reside at Xenia, Illinois. I have resided there practically all my life. I am 37 years of age. I am at present engaged with my father at a small farm at Oskaloosa. I am living with my father. I am ac-

quainted with Mr. Wolf. I have known him a little more than three years. I called at the hotel he operated on South Main Street one time. It was along about the first part of June, on Tuesday evening when I came there. My brother and I came over there together. His wife was already there. She came to see Mr. Wolf. My brother and I came over there on Tuesday evening and stayed all night there. I wasn't in there very much. I was out on the street most of the time, and on Wednesday or the next evening, or the next afternoon, about 4 o'clock I dropped into the hotel and there were several people in there, including Mr. George, Mr. Charles Lucas, my brother and his wife, and some other girl that I didn't know at the time, and Fred Wolkau. I hadn't met Fred Wolkau prior to that time. Wolkau and Wolf were sitting at a table in the office.

"I heard the man they called Mr. Wolkau, I heard him say, 'Well, John, I guess it's about time that we settled up.' Mr. Wolf said, 'It's kind of late, Fred. I don't know where we can get a hold of any notes.' I don't know word for word, but they passed words to each other. They said they could write the notes out which would do just as well. So Mr. Wolf told some lady, I think he called her Mary, to get some paper. She did so. They spoke about a pen and ink and Mr. Wolkau said, 'Well, an indelible pencil would do just as well.' So Mr. Wolf suggested Mr. Wolkau write the note. Mr. Wolkau said, 'You write a better hand than me. You write it.' And Wolf said, 'Now, Fred, how will we fix the consideration?' And he said, 'How would $7500 strike you? Well, Mr. Wolf said, 'That's all right, Fred, I am no hog.' I think that's the way they talked it over. He went ahead to write out the note. Then he said, 'Now the other note, before I write that, do you want to include the interest in it? How will we write that out?' And he said, 'Well, I will pay

you that in cash or money.' I don't remember the word he said. So then they wrote the $1750 note. Mr. Wolf said, 'Fred, we will date this $1750 note back to the time the old note expired.' And he said, 'All right.' So there was some money changed hands. I don't know how much. Mr. Wolkau shoved the notes over on the table to Mr. Wolf. Mr. Wolkau signed them before he shoved them over. He signed them with an indelible pencil. Mr. Wolf gave him his old note, I presume $1750, I didn't see it. And Mr. Wolf said, 'There you haven't signed this $7500 note, Fred.' And he signed that and said, 'Where is my option?' And Mr. Wolf reached in his pocket and pulled out a paper and handed it to him, and he unfolded it and looked at it, and said, 'That's just what I have been wanting to get a hold of,' and that, together with the note he had in his hands, he tore in two or three pieces, two or three times, and threw them into some kind of a container by the table, either a cuspidor or a waste basket. I couldn't say which.''

Heffernan was called as a witness. He was endeavoring to sell the Wolkau property to some other parties. He testified that Wolkau and appellee came to his office together in the spring of 1926 and that Wolkau complained that a story had gotten out that appellee had an option upon Wolkau's property. He also testified that later he received a telephone call from either Wolkau or appellee stating ''that other arrangements had been made about that lot, and that I was to go no further in my efforts to dispose of it.'' Heffernan was doing business for both Wolkau and appellee and never saw any written option. There is no other testimony in the record as to an option given to appellee, except that stated in the writing of deceased of October 4, 1926. No date, description or terms of any kind of a written agreement are given. The deceased did, on the 6th day of May, 1926, in writing, for a con-

sideration of $500 give to ''The Daily Pantagraph'' of Bloomington an option to lease for 99 years upon terms stated or purchase for $60,000 the premises upon which appellee now claims he held an option. The option to ''The Daily Pantagraph'' was to run to June 7, 1927. As a matter of fact, on the 7th day of June, 1926, prior to the time the meeting is said to have taken place in the hotel, the option to ''The Daily Pantagraph'' had been accepted and carried out, a lease executed and delivered for a term of 99 years and Wolkau had conveyed his interest in the lease and in the premises to the Peoples Bank of Bloomington in trust.

On the trial the witness Lucas was impeached by the testimony of numerous witnesses from Decatur, who testified that his reputation for truth and veracity in the neighborhood where he resided was bad. There was no counter testimony. This witness was further impeached in that in the case of *Wolf v. Mattox,* 193 Ill. App. 482, tried in the Moultrie county circuit court in 1914, wherein this appellee was suing upon two similar notes, this witness, testifying for this appellee, stated that he could not read or write. In this case he testified that he did not read a line or letter upon the notes, but that he did read a letter that Wolkau had sent him about the first of June, 1926.

There is testimony in the record that on June 6, 1926, and again on June 7, 1926, the deceased was brought to the Peoples Bank of Bloomington and taken to the directors' room to complete and carry out the contract with ''The Daily Pantagraph.'' At that time deceased was enfeebled and not able to walk. He was brought to the bank in a car by two attendants. The testimony of these attendants and the bank officials is in the record showing his condition, and if the testimony of these witnesses is true, deceased would not have been able to climb the stairway and move about

the rooms of the hotel as Phillips and Lucas testify he did.

The documents in question, other than the notes, both by their appearance upon the face and by all the surrounding circumstances, show such mutilation and alteration that it was reversible error on the part of the court to admit them without further explanation and identification. On the three instruments set out, Wolkau's genuine signature may or may not be attached. The proofs do not tend to show that the deceased intended to sign the instruments submitted. Without these instruments in the record there is no proof of any consideration for the $7,500 note other than the words "for value received" upon the note itself.

"Upon the issue of the making of an alleged note, it is proper to show the habits and customs of the alleged maker which would throw any light on this subject." (*Thorp v. Goewey,* 85 Ill. 611; *Hunter v. Harris,* 131 Ill. 482; *Orr v. Jason,* 1 Ill. App. 439; *Travers v. Snyder,* 38 Ill. App. 379; *Mark v. Miles,* 59 Ill. App. 102; *Gray v. Stein,* 221 Ill. App. 437.)

"The financial condition and transactions at the time of the alleged execution of a note claimed to be a forgery are competent upon the question of genuineness." (*Gregory v. Gregory,* 129 Ill. App. 96; *Schubert v. Schubert,* 168 Ill. App. 419.) "It often happens that it is absolutely necessary to inquire into the financial condition of parties to ascertain which has told the more probable story, in order to ascertain whose evidence is most consistent with the surrounding facts and circumstances." (*Sager v. St. John,* 109 Ill. App. 358, 359; *Gregory v. Gregory,* 129 Ill. App. 96.)

In *Hunter v. Harris,* 131 Ill. 482, where the issue was whether the note was a forgery, the court said: "Under such circumstances, evidence tending to show a reason for the execution of the note, and a reasonable

probability or improbability that the defendant made and delivered the same, was not only competent, but highly important for the consideration of the jury." Also: "As we have seen, the evidence as to the handwriting was conflicting. In such case, the defendant had the undoubted right to make proof of such facts and circumstances as would tend to show the note was not his, and render it improbable that he executed the same. The note is presumed, if unexplained, to have been executed upon the day it bears date, if executed at all."

In *Sager v. St. John,* 109 Ill. App. 358, 359, the court said:

"If the defendant had shown that he had a considerable sum on deposit in the bank at that very time, such proof would tend to render probable his testimony that he did not borrow the sum of plaintiff. On the other hand, if plaintiff had shown that the defendant had no money at the time, it would tend to render probable his testimony that the defendant did ask him for this loan.

"A habit of doing a thing is naturally of probative value as indicating that on a particular occasion the thing was done as usual, and, if clearly shown as a definite course of action, is constantly admitted in evidence." (Greenleaf on Evidence, 16 Edition by Wigmore, vol. 1, 53, sec. 14 J.)

Wigmore on Evidence, vol. 1, p. 166, sec. 92, states: "Of the probative value of a person's habit or custom, as showing the doing on a specific occasion of the act which is the subject of habit or custom, there can be no doubt. Every day's experience and reason make it clear enough." Justice Flandraw in *Walker v. Barron,* 6 Minn. 508, 515, states: "A custom may, like any other fact or circumstance, be shown when their existence will increase or diminish the probabilities of an act having been done or not done, which act is subject

of contest." Sargent in *State v. Manchester & L. R. R.*, 52 N. H. 528, stated: "It would seem to be axiomatic that a man is likely to do or not to do a thing, or to do it or not to do it in a particular way as he is in the habit of doing or not doing it."

In the case of *Citizens' Nat. Bank of Pocomoke v. Custis*, 138 Atl. 261 (53 A. L. R. 1165), the Supreme Court of Maryland stated the following:

"So, on the issue of fraud under the second plea and under the defense permitted by the pleas of nil debet and of non assumpsit, the absence of consideration to the negotiable instrument offered in evidence may commonly be shown by the introduction of circumstantial evidence of the attendant circumstances of the transaction, the relative means and resources of the parties, the nature of their personal and financial relations, their subsequent conduct, and, generally, such other matters of fact as conduce to establish the charge of fraud or of a want of consideration." Then the opinion cites many cases of federal and state courts. The testimony of Appellee Wolf in the probate court was admissible. (*Stump v. Dudley*, 285 Ill. 46.)

It often happens that the case must be established by a number of facts, any of which, by itself, would be of little weight, but all of which, taken together, would prove the issue. Evidence which, standing alone, may not be sufficient to make out a case, may aid in doing so. Testimony not manifestly irrelevant, should not be excluded where its relevancy may be made to appear by proof *aliunde*. (*Central Ry. Co. v. Allmon*, 147 Ill. 471; *Hough v. Cook*, 69 Ill. 581.)

In the case of *Gardner v. Meeker*, 169 Ill. 40, 44, the court said: "The rule is well recognized that other acts of the same nature, if committed at or about the same time and when the same motive may reasonably be supposed to exist, are admissible, with a view to

establish the intent with reference to the matters charged.''

''Evidence of other acts of a similar nature, done by the same person, resulting in injury to other people, . . . is admissible to show fraudulent intent.'' (*Standard Mfg. Co. v. Brons,* 118 Ill. App. 632; *Jordan v. Osgood,* 109 Mass. 457; *Butler v. Collins,* 12 Cal. 457; *Castle v. Bullard,* 23 How. 172.)

In the case of *Butler v. Watkins,* 80 U. S. 456, (20 L. ed. 629), the court said:

''Actual fraud is always attended by an intent to defraud, and the intent may be shown by any evidence that has a tendency to persuade the mind of its existence. Hence, in actions for fraud, large latitude is always given to the admission of evidence. If a motive exist prompting to a particular line of conduct, it being shown that in pursuing that line, the defendant has deceived and defrauded one person, it may justly be inferred that similar conduct toward another, at about the same time and in relation to a like subject, was actuated by the same spirit . . . that the evidence offered was admissible for that purpose is abundantly proved by authorities.''

Wigmore on Evidence, vol. 1, sec. 305, says: ''It has already been noted that the criminality of prior acts thus offered does not affect their admissibility.''

In *Blalock v. Randall,* 76 Ill. 224, it was held, where the defense of forgery was interposed, the defendant having claimed that his signature to notes was obtained by fraudulent device, that: ''This evidence of the fraudulent obtention, by plaintiff from other persons, of notes by means of the same device, in the same neighborhood, near the same time, and while engaged in the same employment, would appear to be admissible to characterize the employment of the plaintiff, and would illustrate the manner in which the alleged fraud upon the defendant might have been accom-

plished—the feasibility of it—and would tend to corroborate the testimony of the defendant.''

In *Boyd v. Boyd,* 164 N. Y. 234, it was held, where other forgeries might be introduced in evidence: ''The grounds upon which evidence of this character has been admitted, have not always been stated by the courts in the same language, but I think there is neither reason nor authority to support the proposition that it must always be limited to cases where motive is material.''

On the trial of the cause appellant offered to prove that soon after the decease of Wolkau, appellee presented a lease of lands belonging to the estate to the witness Dick, acting for appellant. This lease contained no clause binding the executor and representatives and was therefore terminated. Very shortly after this appellee presented the same or a similar lease containing such a clause binding the executor, and it was charged that this was a forgery. The court sustained an objection to the offer.

Appellant offered to prove by a witness and the records of the bank that appellee had never cashed a certificate of deposit in the First National Bank of Bloomington for $1,100 or any similar amount, to contradict appellee's testimony in the probate court. This the court denied. Appellant had the right to show that any and all statements made by appellee as to the execution of and consideration for the notes, or either of them, was false, wherever said statements were made.

Appellant offered to prove while the witness Lucas was on the stand, that the witness Lucas had been a witness for appellee in various other causes in court, to identify and verify instruments charged to be spurious and forged. *Wolf v. Mattox,* 193 Ill. App. 482; *Wolf v. Cunningham,* 224 Ill. App. 634; *Wolf v. Ellison,* 201 Ill. App. 138, and *Wolf v. George A.*

*Sentel,* and other cases. In the case of *Wolf v. Mattox, supra,* the facts involved were very similar to the facts in this case, and in so far as said causes were based upon a similar state of facts, and at about the same time, it was competent to cross-examine the witness Lucas to the fullest extent to show his motive and the motive of appellee. This examination the court denied.

Appellant submitted the record and offered to prove that in 1916 appellee, in the circuit court of Macon county, was convicted of arson to defraud insurance companies and served a term in the penitentiary. The record before us is uncertain as to whether this record of conviction was admitted or not, and we do not consider the competency of that question in any manner.

Numerous rulings by the court upon the admission and rejection of evidence are assigned as error and in many of them the assignment of error should be sustained. To recite all of these rulings in detail would make this opinion, now extended, of too great length.

Appellant offered numerous witnesses of standing to testify that they had known Wolkau, deceased, for years; that they knew the method in which he did business; that his habit and custom concerning all money matters was that he was very close and economical; that in all of his business matters he did not rely upon his own judgment, and that it was his uniform custom, in all business matters, or in the signing of any documents, to consult his banker or his lawyer. Objections to this testimony were sustained. Appellant also offered to prove by the witness Dick and the witness Moore, president of the Peoples Bank of Bloomington, that they were confidants of Mr. Wolkau; that during the year 1926 and before the will was drawn, which was offered in evidence and to which the bank was made executor and trustee, he would talk to them concerning all his business matters, and at no

time did he mention that he had executed any notes of any kind or character to Mr. Wolf, nor say to them at any time that he had given Mr. Wolf any contract or option of any kind of the East Washington Street property. It is insisted that the habits of the deceased, as offered to be proven, were absolutely inconsistent with the testimony that upon Wolkau and appellee sitting down in the hotel to adjust matters, Wolkau at once said: "How would $7,500 strike you?" and that appellee answered, "That's all right, Fred. I am no hog." Such conduct is not reasonable and usual on the part of any kind of a business man and sounds more like the weird strangeness of pure imagination. Appellant offered to prove that it was a habit and custom of the deceased to demand absolute secrecy of his business affairs and that he would not conduct business in the presence of others, except the party with whom the business was conducted or his attorney and banker. Appellee almost corroborated this custom when he testified that Wolkau, the deceased, "ran everybody out of the room" when the notes were made, but he corrected himself as to his witnesses when he added—"except only my relatives." The witness Dick was not permitted to testify as to Wolkau's ability to walk when he was at the bank, and the following questions were asked the witness by appellant but objections made were sustained:

"Q. Did you see him walk, at any time during the month of June, without being carried by two men or assisted by two men?

"Q. Did you know Mr. Wolkau's habit and custom about expenditures of money, as to whether he was what might be termed close and economical or otherwise?"

This was error. The case at bar involved the direct charge of forgery and a conspiracy among appellee and certain of his witnesses to manufacture testimony

and commit forgery to loot the deceased's estate. Appellant should have been given the widest latitude, under the law, to bring out every fact and circumstance which had any material bearing upon the merits of the controversy. Any different rule apparently laid down in *Wolf v. Ellison, supra,* and *Wolf v. Mattox, supra,* is based upon a different set of facts and where the issues were not so broad.

Appellant offered to prove by the witness Wochner, cashier of the American State Bank of Bloomington, that Wolkau was possessed of a large amount of property in the City of Bloomington, valued at $100,000; that his credit was good; that he had at all times, up to the time of his death, credit in the bank up to any reasonable amount—up to $30,000—which he could have utilized; and that Fred Wolkau, Jr., during the time that the witness knew him and up until the time of his last illness, was a careful, prudent business man, knowing how to conduct business and that he was a keen and shrewd business man, and that his general reputation as a good, keen, prudent business man was established in the business communities in the City of Bloomington, to all of which offers objections were sustained. It is the opinion of this court that such testimony was competent in this case. A business man of such standing would not have executed a binding contract and option to the Pantagraph Company on May 6, 1926, upon $60,000 worth of real estate, while he had another binding contract and option outstanding. The Pantagraph contract and option were to expire upon June 7, 1927. The court refused to admit the Pantagraph contract and option in evidence. This was error. It is fair to assume that if Wolkau had given Wolf a binding option to purchase the same property, Wolkau would not have given the Pantagraph an option on May 6, 1926. Wolkau was dead. It was beyond the power of the executor to prove by direct

testimony that Wolkau had not signed an option as claimed by Wolf. Wolf did not claim it was witnessed by anybody. Wolf did not show it was signed in the presence of anybody and as far as the evidence shows, no one ever read or saw this supposed option. The executor, however, could prove that on May 6, 1926, while the supposed option to Wolf was still in full, force and effect, Wolkau did give an option on the same property to the Pantagraph, and this option ran for one year and thirty days. The probative value of the offer of this exhibit is that men in the ordinary course of business will not give options for the sale of the same identical property to two different persons and have both in force and effect during the same time.

Under the ruling of the trial court, no evidence was permissible on these issues except the testimony of the direct positive denial. If such were the law of evidence, then, indeed, the estates of dead men would have little security against the fraud and the conspiracy of others. Substantially the only evidence which the trial court permitted to go to the jury on the part of the defendant was of the handwriting experts and the bankers concerning the opinion of handwriting, and the evidence of the impeaching witnesses.

The materiality of the evidence offered must be gauged by the particular circumstances of the case on trial. No hard and fast rule can be announced concerning the materiality of evidence which would fit every case. Evidence, which to the normal mind will tend to prove or disprove a material matter at issue, is of probative value and unless it violates some fixed rule of law, should be received.

Appellant assigns error in that the witness Tyrrell, a handwriting expert, in order to explain his testimony concerning the signatures to the two notes, desired to illustrate, by crayon upon paper, the variations in the letters and the particular evidences in the

writings upon which he based his conclusion that the signatures were forgeries. The following colloquy took place upon this subject matter:

"Q. Now, will you tell the jury, in your own way, the reasons that you have for arriving at these opinions. If you desire to and can better give your reasons by illustrations, as you go along, so as not to repeat, do so.

"A. I think it would help."

The witness then produced a wooden easel near the witness stand. Counsel for claimant then objected.

"The court: Is he going to make illustrations on the board?

"Counsel for defendant: He is going to point out these letters to illustrate why he has formed this opinion.

"The court: Let him point it out from the exhibit."

To this ruling, defendant excepted.

This question was then asked:

"Q. Do you intend to illustrate on the blackboard?

"A. No, sir."

And the witness then explained that he illustrates on paper with crayon which may be preserved for the record.

Appellee's counsel again objected. Objection sustained, to which ruling the defendant excepted.

It is quite difficult for a handwriting expert to demonstrate to a jury technical matters of this character without illustration. The illustrations that Mr. Tyrrell wanted to make were to be on paper with crayon, and in this manner could have been preserved for the record. Forgeries very frequently are made with such accuracy that they are hard to distinguish from the genuine signature, and frequently the forgery can only be detected by and through the appliance of the art of a competent handwriting expert. If the forgery is a crude affair, then it may be very easy to illustrate the forgery by merely exhibiting to the jury the forged

instrument and the genuine writing, but where the forgery is a good simulation so that the same can only be detected by an expert, then it may be necessary, in order to have the evidence of such expert appreciated and understood by the jury, that he illustrate his points as Mr. Tyrrell attempted to do.

While the court may have discretion in matters of this character, yet that discretion should be exercised reasonably. That discretion should not be abused. In this case, the court could see that the signature to the questioned documents was a remarkably well executed simulation and that for the jury to fully comprehend the evidence of the expert, it would require illustration. Under such facts and circumstances, the discretion of the court should have been so used as to give the jury every aid possible. It is well recognized, particularly in probate proceedings, for the court to zealously guard the estates of deceased persons from fraudulent claims, and especially so where the recipients of the estates are infants, and if the writing could have been illustrated by this means so that the jury could have understood the same, then it would have been proper discretion for the court, to have permitted the witness to have proceeded in this manner. (*McKay v. Lasher,* 121 N. Y. 477; *Dryer v. Brown,* 52 Hun. 321; *Farmers & Merchants Bank v. Young,* 36 Iowa 44, 45 [26 R. C. L. 1016].)

Numerous other assignments of error are made, many of which should be sustained, but as this cause will have to be submitted to another jury, doubtless, upon another trial, they will be corrected.

Appellant contends that the court should have instructed the jury to find a verdict for appellant on the ground that there was no legal, competent evidence in the record showing a consideration for the notes. We cannot adopt this view of the case. There is some testimony in the record, by appellee, that he drew $1,100 from the First National Bank of Bloomington

on a certificate, and paid it or loaned it to the deceased; that he also loaned the deceased another item of $600 or $700. Appellee attempted to establish a consideration for the larger note of $7,500 by the production of a purported written statement of the deceased that the deceased gave to appellee a contract or option for $500 for one year, on February 2, 1926, to purchase the lands leased to the Pantagraph Company on June 7, 1926, and that the consideration of said note was the release and cancellation of such contract and option by appellee. Some attempt is made to show that this contract and option was in writing by showing that at the time the notes were given, a paper, which was torn up, was handed back to the deceased by appellee. No valid contract in writing is shown. However, if, upon another trial, appellee again produces the purported letter or memorandum of October 4, 1926, and by proper proof makes the same admissible in evidence, it would be some testimony for the consideration of a jury upon which a consideration for the note might be based. We are of the opinion that appellee is not required to produce the original written option or contract in evidence, but is only required to prove by some testimony that there was such a contract in existence or entered into and in force at the time the note was given.

Appellant finally contends that the verdict of the jury and judgment of the court are against the manifest weight of the testimony. Upon the elimination of the testimony erroneously admitted, the admission of the testimony erroneously excluded and upon proper instructions given, we have no hesitation in holding that the verdict and judgment are grossly against the manifest weight of the testimony in this record.

For the reasons stated the judgment of the circuit court of McLean county is reversed and the cause remanded for another trial.

*Reversed and remanded.*