402 P.2d 162

**James W. TRIMBLE, Plaintiff-in-Error,**

**v.**

**STATE of New Mexico, Defendant-in-Error.**

**No. 7613.**

Supreme Court of New Mexico.

May 17, 1965.

Bigbee & Byrd G. Stanley Crout, Santa Fe, for plaintiff in error.

Boston E. Witt, Atty. Gen., Oliver E. Payne, Thomas A. Donnelly, Asst. Attys. Gen., Santa Fe, for defendant in error.

MOISE, Justice.

Plaintiff-in-error, hereinafter called defendant, was convicted of first degree murder for the killing of one Oliver Hardeman in Bernalillo County on June 17, 1963. Writ of error was sued out from the sentence of life imprisonment imposed after trial, and pursuant to specification in the verdict of the jury.

Whereas fourteen points are relied on for reversal, because of the view we take with reference to the handling of certain evidence by the police department and prosecutor's office, it will only be necessary for us to discuss the first point argued.

In this point defendant complains of the taking by the police and failure to return a copy of a letter dated May 2, 1963, claimed to have been written by defendant to Bishop Amos, defendant's superior in Detroit, Michigan. In addition, complaint is made of the taking at the same time of some tape recordings, claimed by defendant to have been needed in his defense, and subsequent return in a condition different from when seized, in that the matters material to his defense had been erased from the tapes returned to him.

In order that the situation may be understood and the importance of these items appreciated, we relate such facts as are material to the determination of this issue.

Defendant was a minister of the Christian Methodist Episcopal Church. He was transferred by his presiding bishop, W. H. Amos, from Youngstown, Ohio, to the Phillips Chapel Methodist Church in Al-

buquerque, where he arrived on September 17, 1962. He was joined two weeks later by his wife and five children. At the time of defendant's arrival, Oliver Hardeman was Chairman of the Board of Stewards of the church. However, in April, 1963, defendant removed Mr. Hardeman and certain other members of the Board of Stewards, assertedly because of their failure or inability to raise the money required for meeting the obligations of the church, and replaced the members who had been removed, with new members. However, shortly thereafter, Hardeman was again placed on the board by defendant.

On the evening of June 17, a board meeting was scheduled at the church. Defendant, according to his testimony, arrived early, and had with him a gun which he had that evening removed from the glove compartment of his car because the car had been repossessed. He stated that he had put the gun in a drawer in his house but his wife insisted it be removed from the house so the children would not get hold of it. He accordingly took it to the church and locked it in the bottom drawer of the desk in his office.

Without recounting the facts leading up to the actual shooting, as shown by the proof in the case, there is no question that defendant shot and killed Hardeman that evening in defendant's office. It was the position of the state that this resulted from an argument between defendant and Hardeman over debts owing by defendant on which Hardeman was obligated. It was defendant's position that he shot in self defense when Hardeman approached with a coffee table raised to strike defendant because defendant had accused Hardeman of having made improper advances to defendant's wife, including continuing suggestions that she have unnatural sex relations with Hardeman, and threats against defendant if she refused and, further, that defendant told Hardeman that he had written a letter to Bishop Amos telling him of these facts and that he had made a tape recording of one such conversation. Defendant testified that he told Hardeman that he wanted to read him the letter he had written to the bishop and that he bent over to unlock the drawer where the letter was in a file, and also where the gun was, and when he looked up Hardeman was approaching with the coffee table raised high, whereupon defendant grasped the gun and told him to stop or he would shoot, "because he [Hardeman] had made a lunge, and he had a look on his face, I [defendant] had never seen before."

The day after the killing, June 18, two police officers obtained a search warrant and went to defendant's house where they found and took a brief case containing a pistol holster and a carbon copy of a letter dated May 2, 1963, addressed to Bishop Amos, purportedly written by defendant and advising the bishop of difficulties with

the Chairman of the Board of Stewards because of improper advances being made by him to defendant's wife. Although the officer who took the letter testified that he made four copies of it which he distributed to various files prepared for the police department and the district attorney, the letter and all copies were allegedly lost and could not be produced at trial.

At the same time the letter was taken, twenty rolls of magnetic tape were picked up at the church. The officer who picked them up testified that he only listened to a very small portion of them and locked them in a file drawer. Several officers had access to the drawer, and he did not know if they had all been listened to, or whether they were in the same condition as when received. He admitted that it would be very easy to erase them. In addition, the district attorney first claimed the tapes had not been listened to, contained nothing material to the case, and had been returned. However, it later developed that they had not been returned, whereupon certain tapes were returned but the custody was not traced. It was not testified they were the same tapes or in the same condition.

It is defendant's position under his first point that the taking of the tapes and letter under a search warrant was illegal, and that the failure to return the letter at all, and the tapes in the same condition as when received, resulted in depriving defendant of evidence necessary for his defense and was a denial of due process of law requiring reversal of the case.

Inasmuch as defendant places his principal reliance on the suppression rather than on the claimed illegal taking, we proceed to consideration of the effect of the suppression, and do not consider whether or not the taking was illegal.

■ While not strictly a suppression of evidence in the sense that term is generally used, unquestionably the effect of the officer's actions was just as damaging as if the evidence had been known to the police or district attorney and not to the defendant, this being the ordinary usage of the term. In such situations the United States Supreme Court has clearly held that a denial of due process results. As recently as 1963 it was held, in Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, that suppression of evidence, material either to guilt or punishment and favorable to and requested by accused, was a denial of due process "irrespective of the good faith or bad faith of the prosecution." Defendant here does not charge bad faith but, rather, negligent misplacing or handling of evidence so as to deprive defendant of its benefits. In this position he is indeed charitable inasmuch as it appears that four copies of the letter in question were made and placed in different files distributed to various offices and officers. When needed for trial, and de-

mand was made, neither the original nor a single copy could be located although certainly no one had access to the files except the police or district attorney. Similarly, the tapes were handled in a most careless manner. Defendant asserts that the tapes when taken had on them a certain conversation between deceased and defendant's wife, wherein decedent made indecent suggestions and which defendant states was the basis of the argument preceding decedent's claimed attack on defendant and the shooting which followed. If defendant did have such a tape recording it would go far to support his explanation. If he claimed to have it, but did not, it would give support to the state's theory that the argument was over money and defendant's debts. We can never know if defendant's story was true or false, or could have been supported—not because of anything defendant did, but because of the misdirected zeal of the police officers in the taking into their possession evidentiary material not necessary to the prosecution, and then so grossly mishandling it as to destroy its value for any purpose.

■ We had occasion recently, in State v. Morris, 69 N.M. 244, 365 P.2d 668, to consider rules applicable when evidence was suppressed by officers. While we there concluded no denial of due process was shown, we reviewed the cases and discussed the correct rule. We quote therefrom:

"'This court is in complete accord with the well-recognized rule advanced by appellant, and the authorities in support thereof, that the deliberate suppression of evidence or the use of false evidence knowingly by a prosecuting officer in a criminal case, constitutes a denial of due process of law if such evidence is material to the guilt or innocence of the accused, or to the penalty to be imposed. But, the failure in this case to show materiality of the suppressed evidence or testimony, or prejudice resulting therefrom, renders the rule inapplicable here.

"But appellant asserts that the rule of materiality with regard to false testimony or suppressed evidence is satisfied when such evidence concerns the credibility of the witness. In support of this rule, which appellant contends is applicable in this case, is cited Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9; Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; People v. Savvides, 1 N.Y.2d 554, 154 N.Y.2d 885, 136 N.E.2d 853; Griffith v. Rhay, 9 Cir., 282 F.2d 711; and Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 79 [791]. * * * "* * *

"In United States ex rel. Almeida v. Baldi, 3 Cir., 195 F.2d 815, 33 A.L.R. 2d 1407, the court held that the sup-

pression of evidence may be a denial of due process when it is *vital* evidence material to the issues of guilt or penalty. See also United States v. Rutkin, 3 Cir., 212 F.2d 641 and Soulia v. O'Brien, D.C., 94 F.Supp. 764. In United States ex rel. Montgomery v. Ragen, D.C., 86 F.Supp. 382, the court, speaking in connection with the duty of a prosecuting attorney, said that a prosecutor must, to be fair, not only use evidence against the criminal, but must not willingly ignore that which is in an accused's favor, and held that the perjured testimony and suppressed evidence in that case was vital to the accused's case in that it could only have led to acquittal. See also Application of Landeros, D.C., 154 F.Supp. 183, wherein the court stated it had two questions before it, namely, whether there was a suppression of evidence and, if so, whether it was prejudicial to the accused."

See also, Griffin v. United States (1950) 87 U.S.App.D.C. 172, 183 F.2d 990. Nothing which follows in any way conflicts with our holding in State v. Morris, supra.

■ The state answers by asserting that since the existence of the letter and its contents as explained by defendant on the stand was not controverted, there was no prejudice by virtue of its loss. It is also argued that defendant knew of the letter and should have obtained it from its addressee, Bishop Amos, if in fact it had been sent, as claimed. We do not agree. While first denying receiving it, the district attorney finally admitted they had it and production "at the proper time" was promised. Again, by a question of the district attorney, the jury was informed that the addressee had written the district attorney that he had not received the letter. That the jury would have real doubts that a letter, as claimed, had been written or mailed under the circumstances is easy to understand. On the other hand, to have been able to produce a copy of a letter dated some six weeks before the homicide and with contents as claimed would certainly have been some support by way of corroboration of defendant's account of events leading up to the shooting. Neither do we see where, under the circumstances, the defendant's failure to produce Bishop Amos from Detroit as a witness, or to produce the original letter without his testimony, could be claimed to absolve the state from its own misconduct.

■ And what about the tape recordings? Their availability as corroboration if present as claimed has been lost forever, and the jury was left with the statement by the police that they contained nothing concerning the case. Possibly so, but defendant was deprived of the opportunity to use them to support his defense, and the jury would understandably have doubts

which could have been resolved if the tapes had been present in the condition in which they were on June 17.

The state also argues that since the "suppression" was negligent and not wilful, a different rule applies. That this is not true under the facts here present would seem to be clear in what was said in Brady v. State of Maryland, supra. We also quote the following interesting and helpful language from United States v. Consolidate Laundries Corporation (C.A.2, 1961) 291 F.2d 563, 570:

" * * * [T]he appellants' citations tend to support the conclusion that the negligent suppression of material evidence by the Government entitles a defendant to a new trial. In United States v. Heath, D.C.D.Hawaii, 147 F. Supp. 877, appeal dismissed 9 Cir., 260 F.2d 623 where documentary evidence relevant to the charges and necessary for defense was lost by Government agents, the district judge held that the indictment be dismissed. In Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, the court cited with approval a statement from People v. Savvides, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 855:

'That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing as it did, a trial that could in any real sense be termed fair.'

"The Savvides case has been described as an example of a negligent suppression of evidence. See Comment, 32 N.Y.U.Law Rev. 607, 611. The Napue opinion also cites with approval United States ex rel. Montgomery v. Ragen, D.C.N.D.Ill., 86 F.Supp. 382 where the prosecution was charged with constructive knowledge of a doctor's report favorable to the accused, even though it was not in the State's custody. See also Curran v. State of Delaware, 3 Cir., 259 F.2d 707, 713. Whether the unfairness involved in a conviction under these circumstances, like that involved when evidence is deliberately suppressed, is so fundamental as to amount to a denial of due process of law we do not feel called upon to decide. Compare United States v. Heath, supra, and Curran v. State of Delaware, supra, with Woollomes v. Heinze, 9 Cir., 198 F.2d 577, 579, certiorari denied 340 U.S. 897, 71 S.Ct. 235, 95 L.Ed. 650, and Application of Landeros, D.C.D. N.J., 154 F.Supp. 183. As the Ninth Circuit noted in the course of its opinion dismissing the appeal in Heath, supra, 'There is no necessity to reach the verge of a constitutional question.' 260 F.2d at page 629. * * *"

In that same case the following is quoted from United States v. Zborowski (C.A.2d, 1959) 271 F.2d 661, 668:

· "The prosecutor must be vigilant to see to it that full disclosure is made at trial of whatever may be in his possession which bears in any material degree on the charge for which a defendant is tried. In the long run it is more important · that the government disclose the truth so that justice may be done than that some advantage might accrue to the prosecution toward ensuring a conviction."

While intending to cast no aspersions, we think it in order to direct attention to Canon 5 of the Canons of Professional Ethics applicable in New Mexico (§ 21–2–1 (3) (2.04) N.M.S.A.1953) wherein it is stated that "The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible." Compare In re Imbler, 60 Cal.2d 554, 35 Cal.Rptr. 293, 387 P.2d 6; People v. Reed, 27 Cal.App.2d 484, 81 P.2d 162; State v. Belland, 59 Mont. 540, 197 P. 841; 60 Colum.L.Rev. 858.

Because of our disposition of the point discussed above it is not necessary for us to consider or discuss defendant's additional points, each of which presents interesting and perplexing problems. However, it yet remains for us to make disposition of the present case. In doing so we would call attention to United States v. Heath, (D.C. Hawaii, 1957) 147 F.Supp. 877, appeal dismissed, 9 Cir., 260 F.2d 623. That was a prosecution for income tax evasion. Certain of defendant's books, papers and records had been delivered by him and his accountant to Internal Revenue Service agents. Some of these assertedly contained corrections on them in defendant's handwriting, but when a motion for discovery and inspection of the records was filed, they could not be produced. The court concluded "that the existence of documentary evidence of the corrections is relevant to the charges in the indictment and necessary for the preparation of the defense; that the defendant would be unable to prove the existence of errors in the books without a production of his records which evidence could have a direct bearing on the question of his intent;" and that defendant's constitutional rights would be denied in requiring him to go to trial without this evidence; and that the evidence being lost and unavailable, the indictment should be dismissed.

How similar the situation is here. The presence and existence of the letter and tape recording in order to prove or substantiate defendant's version of the reason for the argument between decedent and himself and to support his claim of self-defense would seem to be too apparent for argument.

While in no sense intending to announce a rule to be applied in every case of lost or misplaced exculpatory evidence, under the facts here present, since neither the letter nor the tapes were available at the trial, we have no alternative but to reverse and remand the cause.

We would add a word to the effect that this is not a case where it can be asserted that the rights of the prisoner are being considered to the exclusion of the rights of the public. Rather, it is to our minds an application of long recognized safeguards of our federal and state constitution necessary to protect a person charged with a crime from excesses which might be practiced in the name of justice by police and prosecuting officers to hinder an accused in the effective presentation of his defense. Out of such abuses dictatorships spring.

We would here quote from People v. Reed, supra:

"While peace officers and officials connected with detection and prosecution of crime should be diligent in ferreting out and prosecuting the guilty they should be fair with an accused. Evidence pointing to his innocence should not be suppressed. For a guilty man to escape punishment is a miscarriage of justice, but for an innocent man to be .convicted is unthinkable."

The cause is reversed and remanded with instructions to set aside the sentence and proceed in a manner consistent herewith.

It is so ordered.

CARMODY· C. J., and CHAVEZ, NOBLE and COMPTON, JJ., concur.