THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVEN NICHOLS *et al.*, Defendants-Appellants.

(Nos. 57102, 57115 cons.;

First District (2nd Division)—March 18, 1975.

374

STAMOS, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Robert M. Gray, and Ian Levin, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Mark R. Harms, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

These are consolidated appeals from judgments entered in a prosecution for armed robbery, rape, burglary and attempt to rape. Defendants

Steven Nichols, Marshall McWilliams, and their codefendant, Willie Chandler, were jointly indicted for these offenses. After a trial by jury, Chandler was acquitted of all the charges; Nichols and McWilliams were acquitted of rape but convicted of armed robbery, burglary and attempt to rape. They were sentenced to serve concurrent terms of 25 to 35 years for armed robbery and burglary; 8 to 12 years for attempt to rape.

In this court, a brief was filed on their behalf in which it was argued that one of the prejudicial trial errors was the State's failure to produce a man's shoe found by the police at or near the scene of the crimes charged in the indictment. However, neither the brief, the abstract nor the record was clear concerning this claim; therefore, we ordered the State to file with us the minutes of the grand jury that indicted defendants. This was done; and based on these minutes, defendants filed a motion requesting reversal of their convictions and remand of the cause for a new trial because the minutes show that at the scene of the crimes, police officers indeed found a shoe they treated as evidence in the case. Defendants alleged that the shoe did not belong to any of them, a fact conceded by the State; that, as a consequence, this was evidence tending to prove their innocence; and that, despite a court order for production of all physical evidence, including evidence favorable to them, the State suppressed the shoe by not producing it in court. We took the motion with the case and, after reviewing the voluminous record of these appeals, we grant it, reverse defendants' convictions and remand the cause for a new trial.[1] The following are the facts and the principles of law that compel our conclusions.

## I.

During the evening of September 5, 1970, a nun, a former nun, and an older woman who was visiting them, had two guests for dinner in their first-floor apartment in Hyde Park on the southeast side of Chicago. The last of the guests left at about 11:40 P.M. A few moments later, the nun retired for the night. The former nun and the older woman remained in the living room, engaged in conversation. Suddenly, a black man armed with a gun entered the apartment. He asked the two women if anyone else was there; and when told the nun was in the bedroom, he forced the women in that direction.

As they approached, the nun, hearing the man's voice, looked out, saw he was a stranger, and tried to close the door. The man, however, forced his way in and threw the three women upon a bed. Then, he closed the

---

[1] Therefore, we do not reach the other issues which defendants, in their brief, present for our review.

door and left; but in a few minutes, he returned with two young black men. Thereafter, and for about an hour and a half, the three intruders were in the apartment. The man who first came in struck the nun on the head with a gun and each tried to rape her. The two other men also attempted rape of the woman. All of them, during a period of time that followed, raped the former nun. One of the men ordered the older woman to remove her clothing; but, because she had a back brace, she could not comply with the demand. By force, the men took money and jewelry from the women. They ransacked the apartment and gathered a television set, a small radio and a typewriter which they placed near the apartment door.

At about 1:40 A.M., the men ran from the building. A woman who lived on the third floor came down the stairs and saw them running out of the apartment. Another woman, from a building across the street, saw an automobile parked heading south, on the street in front of her home. She saw a black man run out of the building on the other side of the street and put a box in the trunk of the vehicle. The woman later said the automobile was a 1962 white Chevrolet hardtop sedan. Her husband, who was awakened by the disturbance, saw the same automobile and noticed that it sagged in the rear. He called the police. In the meantime, the three women were taken to a nearby hospital for examination and treatment. The nun and the former nun were questioned there by investigating police officers and, in the days that followed, in their home. From the morning of September 6, and for a period of a little more than two months, police officers showed the two women mug shots and photographs from which, without success, they attempted to pick out pictures of the men who entered their apartment during the late evening of September 5, 1970.

On November 18, 1970, a police officer went to the home of the two women and showed them some photographs. The nun had told police investigators that she could identify three men she saw in the apartment, but the former nun had said she could identify only the first black man, the one who came into the living room while she and the older women were talking. Consequently, the nun was shown the photos in her attempt to pick out three men. She picked out two pictures: the first, one of Willie Chandler, the second, of Marshall McWilliams. The former nun was shown the photos so she could pick out that of one man. She picked out the picture of McWilliams who, she said, was the first man who entered the apartment, the only one she could identify. As a result, Chandler was arrested that evening as he was walking on a Chicago street and McWilliams that afternoon at his place of employment. From

McWilliams, police officers learned he was acquainted with Steven Nichols. They obtained a picture of him and together with others showed it to the nun; she picked out his picture as being that of one of the men who entered the apartment. This led to Nichols' arrest on December 6, 1970. Following the arrests, and in separate police station lineups, Chandler, McWilliams and Nichols were identified, the nun identifying all three, the former nun only McWilliams.

Thereafter, defendants were indicted and on May 20, 1971, they were brought to trial. Pretrial motions were heard and disposed. Then the State, before a jury, presented its evidence. It called 10 witnesses: the nun, the former nun, two women neighbors, the husband of one of them, the owner of a record shop, a woman doctor, two crime laboratory technicians and a police officer. At the conclusion of this presentation, defendants moved for but the court denied directed verdicts. Then, defendants presented their evidence. They called 12 witnesses who testified in support of alibi defenses that had been interposed. Each defendant testified and denied the charges against him. Their evidence established that at the time of trial, each was 21 years of age. Each said he was gainfully employed at the time of his arrest; and, without contradiction, each testified that neither had ever been charged with an offense other than a traffic ticket. Chandler, in addition to his alibi testimony, denied having known Nichols and McWilliams prior to his arrest. In this regard, he was corroborated by the testimony of Nichols, McWilliams and that of their witnesses.

## II.

Examination of the record before us shows that the State's evidence which tended to connect Nichols with the crimes charged came from two witnesses. (1) A police officer who testified that when McWilliams was arrested, he said he was with Nichols on the day of the crimes. (2) The nun who identified Nichols in court as one of the men who entered her apartment and committed the crimes charged in the indictment. The State's evidence of the same import against McWilliams came from six witnesses. (1) A woman who testified that she awoke at about 1 A.M. the morning of September 6 and saw a white 1962 Chevrolet two-door sedan speed away from the scene of the crimes. (2) Her husband who testified that he saw the car and it was white or light tan in color. (3) The owner of a record shop who testified that in September 1970 he saw McWilliams enter a white 1962 Chevrolet sedan. (4) A police officer who testified that when McWilliams was arrested he told his arrestors that he was in the company of Nichols on the day of the

crimes. (5). The former nun who identified McWilliams in court as the first black man who entered her apartment and committed the offenses. (6) The nun who also identified McWilliams as one of the men who entered the apartment armed with a gun and committed the crimes she described to the jury.

■■ The crucial evidence, however, without which there could not have been sustainable convictions, was the in-court identification of Nichols by the nun and of McWilliams by the nun and the former nun. This fact becomes most decisive in this case when we recall that under our law the testimony of one witness is sufficient for a conviction, even though that testimony is contradicted by the accused, provided the witness is credible and the accused is viewed under circumstances which would permit a positive identification. (*People v. Stringer*, 52 Ill.2d 564, 289 N.E.2d 631; *People v. Stewart*, 24 Ill.App.3d 605, 321 N.E.2d 450; *People v. Smith*, 18 Ill.App.3d 859, 310 N.E.2d 734.) Our courts often say that even if there is alibi evidence by or for the accused, it is for the jury to choose whom it will believe or disbelieve. *People v. Hyde*, 1 Ill.App.3d 831, 275 N.E.2d 239.

In this case, the identification testimony of the two women was positive. Each testified concerning her opportunities to observe the defendant she identified. Unerringly and without hesitation, they picked out particular defendants by name. In addition, when asked both on direct and cross-examination, the two women told the jury that immediately after the crimes, when questioned by investigating police officers, they gave descriptions of the men who invaded their apartment.

In appears, however, that on May 20, 1971, when the defendants were brought to trial, the court decided it would first hear their motions to suppress the State's identification evidence. It was known, of course, that the nun and the former nun were going to appear as witnesses. As the hearing was about to begin, the lawyer representing Nichols and McWilliams told the trial judge that the two defendants did not want to remain in the courtroom because, they said, the two women had not seen them since the police station lineups in November and December of the year before. In a colloquy that followed, the assistant public defender made the same representation and, on behalf of Chandler, joined in the request. The trial judge then questioned each defendant who explained why he was requesting permission to be absent from the courtroom. The requests were granted.

. Thereafter, before the judge, the former nun testified first; the nun, second. In that testimony, both admitted that when questioned by police officers immediately after the crimes, they were not able to give a de-

scription of the men they said invaded their apartment. The principal investigating officer testified that when he questioned the two women, they were not able to give him a description of the men who came into their apartment and committed the crimes they had described. A police officer who said he was the first to respond to the calls made by the neighbor testified that when he questioned the two women, he could not get any information from them that was useful for police investigation.

Then, before the jury, when the nun and the former nun testified, they were not asked by defendant's counsel concerning the testimony they had given at the hearing of the motions to suppress. The two investigating officers were not called by the State when it presented its evidence to the jury did not counsel for Nichols and McWilliams call them as witnesses.

The motions to suppress were denied on Monday, May 24, 1971. Presentation of the State's case to the jury commenced with the nun's testimony the morning of the Friday that followed. However, at the convening of court on the morning of Wednesday, May 26, the assistant public defender, representing Chandler, complained to the trial judge that during the night before his client, Nichols and McWilliams had been taken from their cells in the Cook County jail and photographed. The lawyer said that this was done without notice to counsel. He accused the prosecution of gathering evidence during the trial, including the photographing of the defendants without notice to their lawyers.

The trial judge acknowledged the importance of what was reported to him by saying that he would not permit use in the proceedings of any photograph taken of defendants during their incarceration. Then, the assistant State's attorney in charge of the prosecution responded. He did not deny that defendants had been photographed. In fact, his remarks assumed that the photographs were taken. He denied only that they were taken on his orders. Then, he explained that "I did call the County Jail and asked for photos of blowups of the defendants when taken into the County Jail." On this being said, the assistant public defender demanded a hearing to determine who was responsible for what he stated was an infringement of the defendants' constitutional rights. The trial judge, however, ruled that selection of the jury was to be completed and then "* * * any motions you might have with respect to suppression of any photographs or any evidence certainly would be entertained at that time."

■■ Selection of the jury was completed, but the record shows that thereafter neither lawyer raised any question about the photographs or the use of the blowups which the assistant State's attorney said he had

requested of jail officials.[2] When the nun and the former nun testified before the jury, neither lawyer asked them if they had been shown the blowups or photographs. It appears, however, that in the hearing of the motions to suppress, the nun was asked and admitted that she had been shown photographs of defendants when she appeared before the grand jury and on the day before her testimony.

■■■ The claim that defendants were photographed and the admission by the assistant State's attorney that he obtained blowups of intake photos taken of defendants in the county jail assume grave importance in this case. This was not a display to witnesses prior to trial of defendants' pre-indictment photographs. This, in fact, was the subjection of defendants to a compulsory identification procedure.[3] And relevant to a valid appraisal of this claim is the fact that this was a trial in which the crucial items of proof were defendants' in-court identifications by two young women who undoubtedly had been subjected to a number of cruel crimes. From the way they were questioned before the jury, it appeared that their opportunity to observe the offenders at the time of the crimes was the only source of their in-court identification testimony. The jury was not told about the blowups or about the possibility that photographs taken of defendants during an overnight recess of their trials were available to the prosecution. What they saw was the nun and the former nun picking out each accused by name. This incident, then, one which the trial judge acknowledged was a violation of defendants' constitutional rights, colored what otherwise appears to have been positive in-court identification of defendants by the complaining women. It deserved an immediate inquiry into the circumstances concerning the claimed photographs, the reasons

---

[2] After the verdicts were returned, defendants' lawyer, without objection from the State, made an oral motion for new trial which was denied. This ruling made the entire record open to review on appeal. (*People v. Prohaska,* 8 Ill.2d 579, 134 N.E.2d 799; *People v. Everett,* 117 Ill.App.2d 411, 254 N.E.2d 659.) Nonetheless, appellate counsel did not include this part of the record in the abstract nor has he urged this in the brief filed on defendants' behalf. However, there is no factual dispute between the parties concerning this matter. Therefore, with the broad powers we have under Supreme Court Rule 615(a), and within the allegations of defendants' motion to reverse and remand, we treat this subject as one touching on fundamental fairness and properly before us for review. See Ill. Rev. Stat. 1973, ch. 110A, par. 615(a).

[3] In our view, there is no legal or constitutional difference between putting an in-custody accused before a lineup and putting him before a camera. In the former, he is viewed by persons; in the latter he is viewed by lens of photographic equipment. Both are done for identification purposes. Our research reveals that since *United States v. Wade* (1967), 388 U.S. 218, 18 L.Ed.2d 1149, 87 S.Ct. 1926, was decided, it has been held consistently that an in-custody accused who after indictment is subjected to a compulsory identification procedure without notice to his counsel is deprived of rights secured him by the Sixth Amendment to the United States constitution. See Annot., 22 L.Ed.2d 909, 919-926.

for the prosecution's request, and the unexplained use of blowups of jail in-take photos of defendants whose identifications were then at issue before the court. It would have been proper for defendants to inquire whether, before their jury testimony, the nun and the former nun had been shown the blowups of recently taken photographs of the men they were expected to identify.

Consequently, and without impugning anyone, it is our judgment that immediately on learning of questions concerning the photographs and that, without notice to counsel, the prosecution had obtained the blowups of defendants jail in-take photos, a hearing should have been conducted by the trial judge. The denials by the assistant State's attorney did not answer all the questions, nor were his self-serving assurances adequate. We are sufficiently acquainted with criminal law administration in this community to know that Cook County Jail officials would not photograph a defendant during his trial without the request of someone connected with the prosecution. Certainly there was adequate time. The jury had not been selected. A hearing could have resulted in rulings which would have protected the constitutional and statutory rights involved. It is known by judges and lawyers that in a criminal case, "* * * during perhaps the most critical period of the proceedings * * * that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation [are] vitally important, the defendants * * * [are] as much entitled to such aid [of counsel] during that period as at the trial itself." (*Powell v. Alabama* (1932), 287 U.S. 45, 57, 77 L.Ed. 158, 53 S.Ct. 55.) Therefore, during the recess of their trial while they were incarcerated in the county jail, defendants were entitled to advice of counsel concerning pictures being taken of them and concerning the right of the prosecution to request of jail authorities blowups of photos taken of them when they were delivered to their jailers. Undoubtedly, then, what was reported to the trial court by the assistant public defender infringed on Sixth Amendment guarantees which were fundamental to defendants' rights to a fair trial. (See *Massiah v. United States* (1964), 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199; compare *Spano v. New York* (1959), 360 U.S. 315, 3 L.Ed.2d 1265, 79 S.Ct. 1202.)[4] And in this appeal, Nichols and McWil-

---

[4] For these reasons, we disagree with Mr. Justice Stamos who in his dissenting opinion relies on *United States v. Ash* (1973), 413 U.S. 300, 37 L.Ed.2d 619, 93 S.Ct. 2568 and *People v. Holiday,* 47 Ill.2d 300, 265 N.E.2d 634. *Ash* and *Holiday* were cases in which preindictment photographs of a defendant were displayed to prosecution witnesses during the preparation for trial. In both instances, it was held that defendant did not have the right to the presence of counsel at the display. Of course, we agree with these doctrines; but, in our judgment, they do not apply to the case before us. Moreover, it should be observed that in *Holiday,* the Supreme Court dis-

liams are not bound by the fact that their lawyer did not demand a hearing and later did not pursue the matter. We base this conclusion on incidents which the record before us discloses.

### III.

It appears that after an extended hearing, the trial court denied defendants' motions which sought suppression of the State's identification evidence, statements made by Nichols and McWilliams at the time of their arrests and evidence obtained from Chandler when he was taken into custody. Immediately thereafter, but before any step was taken to select the jury, both lawyers for the defense asked the trial judge for a continuance on the ground that they were not prepared to proceed with defense of the case. Each lawyer represented to the court that the hearings of the motions had brought to their attention facts which required further investigation before they could adequately protect the rights of their respective clients. The record suggests that prosecution attorneys had advised the court and counsel that the nun was going to Europe on a vacation and the principal investigating officer was going on furlough. Both defense lawyers, however, asked the court that the continuance be made to coincide with the return of the two prosecution witnesses. The motions were denied; and the trial continued through final pretrial matters, selection of the jury, followed by an overnight adjournment.

At the reconvening of court, Nichols announced that he had a motion he wanted heard. The motion was handwritten, apparently prepared in the county jail either by him or by someone for him. The document stated Nichols was serving notice that he was removing his privately retained counsel for the reason that the lawyer had displayed a lack of interest in his clients. Then, citing a number of United States Supreme Court cases and "* * * arguing in his due process of law * * *," Nichols stated that until he obtained other counsel "* * * [h]e will act in 'propria persona'." McWilliams joined in the motion; and in a colloquy with the court that followed, both defendants said they did not want to delay the trial; they insisted, however, on the opportunity to discharge their lawyer. Their motions were denied. The trial continued, and the record shows it was thereafter that the lawyer did not raise any questions about defendants having been photographed in the county jail or about the prosecutor's possession of blowups of their jail in-take photos. During the jury testimony of the nun and the former nun, the lawyer did not

approved of photographic displays of a defendant after he is in custody. (47 Ill.2d 300, 307.) From this fact, we are constrained to believe that photographing a defendant during his trial, without notice to his counsel, is prosecutorial conduct which that Court would condemn.

ask them questions which would have determined whether they had been shown recently taken photographs of the defendants or blowups of their jail in-take photos. From our view of these matters, such questions would have touched, directly or indirectly, on important constitutional rights of the defendants. See *Powell v. Alabama* (1932), 287 U.S. 45, 77 L.Ed. 158, 53 S.Ct. 55; *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L.Ed.2d 799, 83 S.Ct. 792; *Gilbert v. California* (1967), 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951; *Stovall v. Denno* (1967), 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967.

It cannot be said that the inactions of the lawyer were decisions made in defendants' interests. No benefit accrued to them when the lawyer did not insist that the trial judge immediately hold a hearing into the facts reported by the assistant public defender. Certainly, no benefit accrued to defendants from the lawyer not asking the nun and the former nun questions which fully would have developed the facts shown in the record before us. Therefore, the failures of the lawyer were not trial tactics or strategy. (Compare *People v. Williams*, 36 Ill.2d 194, 222 N.E. 2d 321.) They were omissions of a lawyer who, in open court, had confessed that he was not prepared to proceed with the defense of serious criminal charges against his clients. Or, to give retrospective meaning to Nichols' scrawled petition, they were inactions which had shown a lack of interest in the case. In fact, the inaction of the lawyer adversely affected important rights that belonged to the defendants.

■■ Our law recognizes the difference between a lawyer's conduct that is part of a trial plan and failures or omissions that waive a defendant's statutory or constitutional rights. (See *People v. Novotny*, 41 Ill.2d 401, 244 N.E.2d 182; *People v. Kaprelian*, 6 Ill.App.3d 1066, 286 N.E.2d 613; compare *Brookhart v. Janis* (1966), 384 U.S. 1, 16 L.Ed.2d 314, 86 S.Ct. 1245; *United States ex rel. Goldsby v. Harpole* (5th Cir. 1959), 263 F.2d 71; Tigar, *Waiver of Constitutional Rights: Disquiet in the Citadel*, 84 Harv. L. Rev. 1, 16-19 (1970); Note, 54 Cal. L. Rev. 1262 (1966).) Generally, it is said that waiver by counsel as a matter of trial strategy is binding on an accused, while waiver of rights not constituting trial strategy will not bind an accused unless he participates in the waiver. (*People v. Whitfield*, 40 Ill.2d 308, 239 N.E.2d 850.) In this case, Nichols and McWilliams did not participate in any waiver of their rights. In fact, they sought to discharge the lawyer; and there was a time during their trial when they refused to cooperate with him because they saw he was not defending them. Therefore, it would be unjust to tell them now that the failings of the lawyer they tried to discharge preclude their being heard in this court on matters that adversely affected their right to a fair trial.

## IV.

This brings us to defendants' claim that their convictions were obtained by the State through the suppression of evidence favorable to them. And to consider it, we begin with the grand jury minutes which show the following testimony of the principal investigating officer.

"Q. Was physical evidence recovered at the scene of the incident on September 6, 1970?

A. Yes, below the window of the apartment where entry was made, a shoe was found.

Q. Was it a peculiar size or number?

A. The shoe was a loafer, size 8 male shoe.

Q. Did any of the individuals who were arrested in this matter wear a size 8 shoe?

A. Marshall McWilliams and Nichols wears 8 and a half."

Prior to their trial, a motion was filed on defendants' behalf requesting the issuance of "* * * an order compelling the [State] to disclose and produce or otherwise make available evidence in [its] possession and control * * * which * * * may be favorable to the defendants and material to the issue of guilt or innocence or could in any way weaken or affect any evidence proposed to be introduced by [them]." One paragraph of the motion requested that the disclosure and production include all physical evidence in the State's possession that pertained to the case. This motion was answered, in writing. The answer, in the form of a bill of particulars, listed all of the State's physical evidence, but did not mention the shoe. Then, on the day defendants were brought to trial, the court made a paragraph by paragraph ruling on the motion and ordered the State to produce for defendants' inspection all evidence in its possession favorable to them and all its physical evidence that pertained to the case. A session of a day was set aside for defense counsel to inspect the State's evidence. Accordingly, a sealed evidence box and two inventory envelopes were brought into the courtroom by an assistant State's attorney.

At the beginning of the inspection, the lawyer representing Nichols and McWilliams inquired about the shoe. The assistant State's attorney answered, saying that it was not going to be introduced in evidence by the prosecution. On hearing this said, the assistant public defender asked, "May we look at the shoe?" To this, the assistant State's attorney replied, "We don't have it." The public defender then asked, "Where is it?" No one answered; but he pursued the matter further, saying, "It is mentioned in the Grand Jury testimony. We want to look at it. Some police officer has it." There then followed a short series of exchanges among the lawyers, but the State did not produce the shoe.

In this court, both in their joint brief and in their motion to reverse and remand, defendants make the contention that withholding production of the shoe was suppression of evidence that aided the State in obtaining their convictions. They argue that the shoe did not belong to them; from where it was found it supported the inference that someone else entered the apartment and committed the crimes for which they were convicted. Thus, defendants argue that the shoe was consistent with and would have supported their alibi defenses, a fact which may have led to their acquittals. Therefore, they conclude they were denied due process of law when the State suppressed the shoe by not producing it, despite the court order which required production of all physical evidence in the State's possession that was favorable to them and which pertained to the case.

The State does not deny existence of the item defendants claim was suppressed. In fact, in its brief, it admits that "[t]he police found a shoe in the victims' apartment. It was found that the shoe did not relate to any of the defendants." Furthermore, the State concedes that defendants made the necessary demand for production of the shoe. No claim is made that it could not be produced when the physical evidence was brought into court for defendants' inspection. It is not claimed that its discovery was mysterious or illusive; indeed, the shoe was subjected to laboratory tests, and for the prosecution, it was determined that it did not belong to any of the accused. The State's only argument is that defendants have not shown that the shoe was evidence favorable to them or that it was material to their defense. This being so, we need not decide whether in this case there was wilful suppression of evidence. It being conceded that the shoe was treated as evidence in the State's possession; it appearing that the State could have produced it but withheld it after defendant's demand, therefore, the only question we need decide is whether it was of favorable character to defendants and material to their defense. (*Moore v. Illinois* (1972), 408 U.S. 786, 794, 33 L.Ed.2d 706, 92 S.Ct. 2562.) In doing so, we bear in mind that denial of due process of law in instances like the one before us does not depend on the good faith or bad faith of prosecuting officials. (*Brady v. State* (1961), 226 Md. 422, 174 A. 2d 167.) "A prosecution that withholds .evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant." *Brady v. Maryland* (1963), 373 U.S. 83, 87-88, 10 L.Ed.2d 215, 83 S.Ct. 1194.

■■ Therefore, turning to the question, we have no hesitancy in concluding that under the circumstances of this case the shoe withheld by the State was favorable to defendants and material to their defense. The word "favorable" means to be "*  *  * disposed to favor  *  *  *

giving a result that is in one's favor  * * *  indicative of a successful outcome  * * *  boding well  * * *." (Webster's Third New International Dictionary 830 (Unabridged ed. 1964).) Evidence is material to the guilt or innocence of a defendant when it is of probative character on that question. (*Link v. United States* (8th Cir. 1965), 352 F.2d 207.) It is probative when to the normal mind it tends to prove or disprove a matter at issue. *Wolf v. Peoples Bank*, 255 Ill.App. 127, 157; compare *United States v. DeLucia* (7th Cir. 1958), 256 F.2d 487, 491; *Fuller v. State* (Ct. App. Ala. 1926), 113 So. 648; *Jones v. Sands* (1953), 41 Tenn. App. 1, 292 S.W.2d 492; 31A C.J.S. *Evidence* § 159 (1964).

■■ In determining whether this particular shoe was evidence favorable to defendants, we are persuaded by the grand jury testimony of the principal investigating officer who said it was found underneath a window that led into the apartment where the crimes were committed. Defendants denied the charges against them, interposed the defense of alibi and introduced evidence in their support. Implicit in their defenses was the claim that they were not at the scene of the crimes; that some other person or persons committed those offenses. The shoe then, examined by defendants, could conceivably produce evidence or clues that would substantiate their claim. It was they who had the right to inspect the shoe for marks or clues favorable to them. (*People v. Flowers*, 51 Ill.2d 25, 281 N.E.2d 299.) The trial court had ordered the State to produce evidence in its possession favorable to defendants, and the physical evidence pertaining to the case. "When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful." *Griffin v. United States* (D. C. Cir. 1950), 183 F.2d 990, 993; *Jackson v. Wainwright* (5th Cir. 1968), 390 F.2d 288; compare *United States v. Bryant* (D.C. Cir. 1971), 439 F.2d 642; *Shuler v. Wainwright* (M. D. Fla. 1972), 341 F.Supp. 1061; compare *People v. Endress*, 106 Ill.App.2d 217, 245 N.E.2d 26; see Annot., 7 A.L.R. 3d 8 (1966).

In determining whether the shoe in question was material to defendants' defense, we should consider the issues and all the evidence in the case. Accordingly, we observe what the nun told the jury. She testified that a few days before the crimes, she and the former nun had wiped and cleaned all the woodwork in their apartment; and that immediately after the intruders left in the early morning hours of September 6, 1970, she saw smudge marks on the walls and woodwork. A crime laboratory technician testified that immediately after the police were called, he went to the apartment and thoroughly examined it for fingerprints; that he found none that could be connected with any of the defendants; but

near a window, he found a positive identifiable palm print that did not belong to any occupant of the apartment nor to any defendant. Therefore, on the issue raised by defendants' alibi defenses, whether the evidence proved that someone else committed the crimes with which defendants were charged, the shoe, together with the palm print that belonged to some stranger, was material to the issue.

In *People v. Hoffman*, 32 Ill.2d 96, 203 N.E.2d 873, the defendant was charged with the murder of a woman with whom, by his admission, he had registered as man and wife in a Chicago hotel. It was his claim that at about 6 in the evening he left the woman in the hotel, but returned 12 hours later and found her dead. At his trial, his counsel asked to see a pair of blue and white men's shorts which the defense learned was discovered by investigating police officers in a closet of the room where the body of the woman was found. The request was denied; and then, by successful objections to questions asked of police officers and by disallowing knowledge of the existence of the pair of shorts, the prosecution prevented defendant from gaining possession of them. In the appeal from his conviction, defendant contended that by withholding the pair of shorts, the State had suppressed evidence favorable to him and material to his guilt. The State argued that he had not shown that the shorts were material to his defense. The supreme court disagreed. It said, "[c]ontrary to the assertion that the defendant did not show the materiality of the shorts, it appears obvious from the very item, its condition and where it was found, that it was material. They were material enough to be noted on the police report and are material enough to require their production upon defendant's request so he could inspect them for laundry marks or other clues. They were potentially as material, if not more so, than the items of the deceased's clothing offered and received in evidence." 32 Ill. 2d 96, 99.

We are of the same opinion in this case. The shoe should have been produced in court for defendants' inspection. (See *People v. Murdock*, 39 Ill.2d 553, 237 N.E.2d 442; *People v. Dixon*, 19 Ill.App.3d 683, 312 N.E. 2d 390; *Trimble v. State* (1965), 75 N.M. 183, 402 P.2d 162; Annot., 34 A.L.R. 3d 16 (1970).) Therefore, based on the facts we have stated and the principles of law we have applied, the judgments are reversed and the cause is remanded for a new trial, or for further proceedings not inconsistent with views expressed in this opinion.

Reversed and remanded with directions.

HAYES, J., concurs.

Mr. JUSTICE STAMOS, dissenting:

I respectfully dissent from the majority opinion and would find no error concerning either the mysterious pictures or the equally mysterious shoe.

As regards the alleged photos, the majority opinion relies on two propositions. First, the photographing of defendants, after indictment and without counsel, infringes on defendants' sixth amendment right to counsel. Second, since the in-court identification of defendants by the victims was crucial, the failure of counsel to fully investigate the alleged photo session denied defendants a fair trial. On the basis of the present record, I cannot agree with either proposition.

It is clear that an accused does not have a constitutional right to have counsel present when the State conducts a post-indictment photographic display for the purpose of allowing a witness to attempt an identification of the offender (*United States v. Ash*, 413 U.S. 300). No greater guarantee is found in the Illinois constitution. In *People v. Holiday*, 47 Ill.2d 300, 265 N.E.2d 634, a witness observed a murder but refused to cooperate with the police. Five months later he was subpoenaed for the trial and after being shown photos only of defendant, identified defendant. On review, the court refused to hold that defendant had a constitutional right to the presence of counsel at the photographic display. While *Ash* and *Holiday* did not involve the post-indictment taking of pictures, I see no substantial constitutional difference. Rather, I would compare the taking of pictures with the taking of fingerprints, hair, clothing, and other blood samples. (413 U.S. 300, 314-315.) While the facts of *Ash* are not directly controlling, the reasoning most certainly is. Since it is clear that there is no right to counsel at the photographic display itself, how then can there be a right to counsel at the mere taking of those pictures?

The majority's second proposition, that defense counsel's failure to inquire into the photo session denied defendants a fair trial, is premised on conjecture and speculation. For the majority's argument necessarily assumes that the photos, if they ever existed, were used by the prosecution to refresh the victims' recollections. However, there is no evidence in the record to this effect. Although the record indicates that photos were taken, they may not have developed; or if developed, they may not have been delivered to the prosecution; or if delivered, they may not have been used by the prosecution. The majority's argument becomes persuasive only if all these actions had, in fact, occurred. For if the pictures were never used there was nothing to inquire into.

In this regard, it should be noted that two full days elapsed between the alleged photo session and the start of the trial. It is entirely possible

that during that interval, defense counsel discovered that the prosecution had not used the photos complained of and did not intend to use them. Such a possibility is entirely consistent with the trial judge's unambiguous remark that he would not allow any such photos to be used during the proceedings and consistent with defense counsel's proven perseverance on defendants' behalf during 4 days of pretrial hearings to suppress evidence. Had the prosecution not shown the photos to the victims, any questions propounded by defense counsel during trial regarding them would have inured to defendants' detriment, not benefit. For any such questions would only emphasize that the in-court identifications were based on the ample time for observation in the apartment.

In this regard, the majority overlooks the possible application of the independent origin doctrine. For even assuming that the pictures were taken and used as suggested by the majority, the courts have repeatedly held that the existence of an independent origin will validate an in-court identification even though a previous identification procedure may have been impermissibly suggestive. (*People v. Connolly*, 55 Ill.2d 421, 303 N.E.2d 409; *People v. Jackson*, 54 Ill.2d 143, 295 N.E.2d 462.) While I recognize that the majority is most disturbed by counsel's failure to inquire into this area, rather than the actual admissibility of the identification testimony, I note that there has never been any claim of counsel's incompetency.[1] Counsel could have decided not to inquire because he knew there was nothing to inquire into or because of valid trial tactics.[2] And even if there had been something to inquire into, in view of the victim's positive identification of defendants, I cannot say that the verdict would have been any different.

Finally, I note that this issue was never raised by trial counsel after it was originally brought to the court's attention, and it was not mentioned by able appellate counsel who saw fit to raise other numerous issues. I am wary of a reversal and remand partially predicated on an issue not found significant by two different sets of attorneys and which occupies barely two pages in a 2000-page record and about which we know very little. In short, I am not convinced that this record presents a sufficient basis for this court to now, on its own motion, question the actions of counsel on a matter so nebulous and vague and a matter not questioned until today.

---

[1] In fact, at the conclusion of the trial, the trial judge commended defense counsel on the "excellent job" done on behalf of his clients.

[2] In view of the victims' persistent positive and unshaken identification of defendants, counsel might well have chosen not to emphasize that testimony any more than absolutely necessary.

I now turn to the question of the mysterious and elusive shoe. At the outset, I must note that the record presented to this court contains no concrete facts concerning the now crucial shoe.

Even where the shoe was found is in serious doubt. During the grand jury testimony, the shoe was found "below the window of the apartment where entry was made." During a hearing on a pretrial motion, the shoe was placed "at the premises." However, in both briefs filed by defendants and the State, the shoe was discovered "in the apartment." In the majority's opinion, the shoe is described as "at the scene of the crimes."

If the precise location of the shoe was the only fact in dispute, then the instant record would present no greater ambiguity than the ordinary appeal. However, two other crucial facts are also left to conjecture and speculation. It is obvious that essential to any determination of the materiality of the shoe is a resolution of whether the shoe did, in fact, belong to one of the assailants and/or whether it did, in fact, belong to one of the defendants.[3] The resolution of either of these questions is impossible on the state of the present record.

Confusion as to whether the shoe belonged to one of the assailants is especially pervasive. During a hearing on a pretrial motion, the attorney for one of the defendants stated:

"I looked at the Grand Jury testimony and I see where supposedly one of the assailants lost his shoe at the premises."

However, a reading of the grand jury testimony reveals that at no time was the shoe actually determined or even stated to belong to one of the assailants. The defendants' brief continues the confusion by summarily stating that a shoe was found "belonging to one of the offenders."[4] The State's brief is no more helpful. It merely states that the meaning of the shoe is "open to conjecture."[5] While the majority opinion does not go so far as to conclude that the shoe belonged to one of the assailants, that conclusion is implicit in the opinion. Any other conclusion would negate any materiality for the shoe. For example, that some other person had been on the scene several months prior to the crime would be irrelevant at a trial of the defendants.

Another crucial factor involved is whether the shoe belonged to any of the defendants. While all parties seem to agree that it did not, I can find nothing in the record to support such a conclusion. In fact, the only

---

[3] For purposes of argument only, I assume that there may be a difference between the actual assailants and the defendants before the court.

[4] Meaning assailants.

[5] To further add to the confusion, during oral argument, the State informed the court, although on what basis is unclear, that there is no evidence that the shoe belonged to an assailant and further that the State can not connect the shoe to anyone.

apparently first-hand evidence in the record concerning the shoe came during the grand jury testimony. And there it was stated that defendant McWilliams did indeed wear the same size shoe as that found and defendant Nichols wore a half size larger.

The confusion in the present record has not been diminished in any way by the existence of certain laboratory tests run on the shoe. During that now familiar hearing on a pretrial motion, counsel for one of the defendants stated:

> "According to the lab reports I see a fair amount of testing done with the shoe * * *."

However, those reports have not been included in the record and while trial counsel apparently had access to the reports, appellate counsel indicated during argument that they had not seen them.

It is on the basis of this record that defendants ask us to overturn a jury verdict and order a new trial. On the evidence before us, defendants ask not only that we find a suppression of the shoe by the prosecution, but that we find that the shoe was evidence favorable to them and material to their defense. (*Moore v. Illinois,* 408 U.S. 786.) To support their prayer for relief the defendants have presented nothing more than speculation and conjecture. In seeking an affirmance, the State has done no better. I can not say that any of the theories advanced by either side are incredible or unworthy of belief. However, I also can not make a reasoned and rational determination of the character and materiality of evidence when at every turn uncertainties and confusion are encountered. I can not determine the materiality of evidence when I do not know where it was found or to whom it belongs. It is impossible to determine whether evidence is favorable to the defendants when I have no idea of how it could be used at a new trial. Appellate adjudication should be based on something more firm than speculation and conjecture. Consequently, if I did view the nonproduction of the shoe as a suppression of evidence within the meaning of *Brady v. Maryland,* 373 U.S. 83, I would urge a remand of the instant case so that the doubts and confusion could be resolved and a proper record presented for appeal. However, for the reasons set out below, I find it unnecessary to resolve the confusion and would find no error in the nonproduction of the shoe.

The majority characterizes the State's actions as a suppression of evidence within the meaning of *People v. Hoffman,* 32 Ill.2d 96, 203 N.E.2d 873. I disagree. In *Hoffman,* the State not only disavowed knowledge of the existence of evidence apparently in its possession, but repeatedly thwarted defense counsel's attempts to elicit testimony regarding that evidence. In *Hoffman,* as in all the cases cited by the majority, and in

all that I have discovered, there was an intentional or negligent concealment or nondisclosure of evidence held by or known to the State. It would serve no useful purpose to describe all the factual situations in which an actual suppression of evidence within the meaning of *Brady* has been found. Suffice it to say that *Brady* only comes into play when the State actively withholds evidence favorable to the defense. *Brady* finds application only where defense counsel is hampered in preparing an effective defense by the suppression of evidence favorable to the defense. (*People v. Yonder*, 44 Ill.2d 376, 256 N.E.2d 321.) Brady was enunciated to prevent the deliberate suppression of evidence with a purpose to obstruct that defense. (*United States v. Houle* (2nd Cir. 1973), 490 F.2d 167.) The instant facts do not support such a conclusion.

Rather, the instant case clearly falls within the settled rule that where defense counsel knows of the evidence and the State does not deny its existence, there can be no suppression of evidence. In *People v. Nischt*, 23 Ill.2d 284, 178 N.E.2d 378, the State admitted that a report of an experiment had never been turned over to defense counsel. However, the court found that defense counsel knew of the facts of the experiments and thus there could be no suppression of what the attorney knew. In *People v. Smith*, 46 Ill.2d 430, 263 N.E.2d 860, the defendant's shorts and pants had been sent to the crime laboratory. When the State failed to introduce the clothing or the tests, defendant claimed suppression. However, the court found that defendant knew his clothing had been sent to the crime laboratory for examination. He did not demand that the clothing or tests be produced in court. That, coupled with his knowledge, precluded a finding of any suppression. See also *People v. Hudson*, 38 Ill.2d 616, 233 N.E.2d 403.

That same rule has been followed by the Federal courts. In *United States ex rel. Wax v. Twomey* (7th Cir. 1972), 465 F.2d 352, Mr. Justice Clark wrote that arguments based on *Brady* are inapposite when counsel had knowledge of the supposedly suppressed evidence. In *United States ex rel. Raymond v. People* (7th Cir. 1971), 455 F.2d 62, although defendant knew of the suppressed evidence, the court granted a petition for habeas corpus because defendant's counsel was not aware of that evidence. However, in dissent, Justice Hastings stated the law applicable in the instant case:

> "[N]o case has been cited since *Brady*, and we know of none, wherein a court has found that evidence has been suppressed in violation of *Brady* when either the defendant or his attorney had knowledge of the evidence." (455 F.2d 62, 73.)

Although *Raymond* indicates that there may still be a *Brady* violation

when the defendant alone is aware of the suppressed evidence, as the dissent makes clear, there has been no case finding a suppression of evidence when defendant's counsel is aware of the evidence.

That this should be the rule is only logical. It is impossible to suppress something when the other party is aware of its existence and the State agrees that it exists. (See *Lawrence v. State* (Fla. App. 1971), 244 So.2d 446.) And that is exactly the case before us. At no time has defendant indicated "what was suppressed. All parties concede that the defense knew the shoe existed. In fact, defense counsel apparently had the lab reports themselves on the shoe. It hardly needs explanation that the lab reports of the shoe are much more important than the shoe itself. The shoe is merely a prop that can be waved before the jury. The results of the tests on the shoe would give that prop substance and meaning. I will not speculate on what the lab report stated. However, it is important to note that defense counsel had that report and by his actions found it less than essential to preparing his defense. It can not be disputed that defense counsel knew of the shoe's existence and had the lab reports before him. Presented with such a set of facts, I find it impossible to understand what was suppressed and consequently can find no violation of the *Brady* doctrine.

However, that determination leaves one final question to be resolved. What is the effect of the State's failure to produce the shoe in the face of defendants' motion to produce "all physical evidence that is in the State's possession and control which pertains to this case?"

Defendants' discovery motion was granted with respect to the production of physical evidence. In response, the State filed an answer listing the physical evidence as:

"Clothing, slides, smear test apparatus, photographs, guns and license plates."

The next reference to the physical evidence came during a hearing on a pretrial motion. Mr. Downs, attorney for acquitted defendant Chandler said:

"Judge, I would make a motion to inspect physical evidence in this particular case. It is somewhat difficult from the list of witnesses and looking at the Grand Jury testimony, that—

THE COURT: What physical evidence does the State have?

MR. DOWNS: I don't know. I looked at the Grand Jury testimony and I see where supposedly one of the assailants lost his shoe at the premises. According to the lab reports I see a fair amount of testing done with the shoe  *  *  *."

The matter was then dropped and not raised again until the next day

when all attorneys inspected the physical evidence in the presence of the court. At that point, Mr. Mehl, attorney for defendants McWilliams and Nichols asked:

"Where is the shoe?

MR. KAVANAUGH [Assistant State's attorney]: We are not going to introduce the shoe.

MR. DOWNS: May we look at the shoe?

MR. KAVANAUGH: We don't have it.

MR. DOWNS: Where is it? It is mentioned in the Grand Jury testimony. We want to take a look at it. Some police officer has it.

MR. KAVANAUGH: It is not listed in our physical evidence.

MR. DOWNS: It is mentioned in the Grand Jury testimony.

MR. KAVANAUGH: It doesn't pertain to your man, anyway." There is not another word in the record regarding that shoe until now on appeal.

There can be no doubt that there was, in fact, a shoe found by someone, somewhere, and somehow connected to this case. As such, I cannot completely approve of the State's failure to produce that shoe in response to defendant's motion. However, I also cannot approve of defendants' much-delayed interest and curiosity in the shoe.

The concept of the adversary process has long been the mainstay of our judicial system. The courts depend, perhaps unwisely, on opposing counsel to bring forth all relevant and material evidence. The record in this case consists of almost 2000 pages. In that entire record, the now ubiquitous shoe is mentioned twice, as set out above. At either time, defendants' attorney had only to turn to the trial judge and ask that the State be ordered to produce the shoe, but he failed to do so. He should not now be heard to complain of his own disinterest.

Although I recognize that discovery should proceed in an orderly and uniform manner and that defendants should not be required to ask specifically for each item of evidence, in this case defendants' attorney knew about the shoe, possessed the lab reports on that shoe, and merely decided not to pursue the matter. In an analogous situation, one court held such action legitimate trial strategy and refused to find any error. *United States ex rel. Wilson v. United States* (E.D. Pa. 1971), 330 F.Supp. 822.

In *People v. Embry,* 12 Ill.App.3d 332, 297 N.E.2d 604, both parties ignored the other's request for discovery. On appeal, the defendant argued that the State's failure to disclose certain statements entitled him to a new trial. The court rejected that argument stating:

"Here both parties saw fit to make the initial request for disclosure but neither party became exercised over the other party's failure to comply. Had defendant desired to insist upon his right of dis-

closure, redress was available to him in the form of a request to the court for an order of compliance, for a continuance, or even for an exclusion of such evidence. * * * We find that the failure of defendant to seek such redress constitutes a waiver of his right to disclosure the same as if he had not asked for it in the first place, and, having failed to give the court an opportunity to rule prior to commencement of trial, he cannot be heard to complain for the first time in his motion for a new trial." (12 Ill. App.3d 332, 335.)

Although *Embry* was applying the rules of discovery enacted subsequent to the instant case, its reasoning is not so limited and is peculiarly appropriate to the instant facts.

In *People v. Jelks*, 92 Ill.App.2d 374, 235 N.E.2d 339, defense counsel properly asked for the production of certain statements during trial examination. When the State inquired into the purpose of such a request, defense counsel withdrew his request. On appeal, the defendant argued that the State made spurious objections to a proper request for production of statements and therefore suppressed that evidence. The reviewing court disagreed, holding that the State did not object but merely inquired as to the defendant's purpose. The court found that since defendant's action was a voluntary waiver, he could not complain of error. In the instant case, defense counsel knew of the shoe and in the presence of the trial court, decided not to pursue its production. I find such action analogous to that in *Jelks* and *Embry*.

I believe the burden of pursuing discovery belongs on the parties involved, not on the trial judge. *Brady* does not make it incumbent upon the trial judge to rummage through the State's file on behalf of defendants. (*United States v. Frazier* (4th Cir. 1968), 394 F.2d 258.) Consequently, I would find no error in the nonproduction of the shoe.

Since my views will have no effect on the ultimate order of this court, I do not reach the other issues raised by defendants.